ELVIE COBB, TRANSFEREE OF THE ESTATE OF CARRIE MAY DUNCAN, DECEASED, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Cobb v. Commissioner
Docket Nos. 11848-83, 22372-83, 22373-83, 22374-83, 22375-83.
United States Tax Court
T.C. Memo 1985-208; 1985 Tax Ct. Memo LEXIS 425; 49 T.C.M. (CCH) 1364; T.C.M. (RIA) 85208; April 30, 1985. Jesse T. Mountjoy, for the petitioner in Docket No. 11848-83. Joseph E. Ternes, Jr., for the petitioners in Docket Nos. 22372-83, 22373-83, 22374-83, 22375-83. Scott R. Cox, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies in Federal gift tax, additions to tax, and Federal estate tax, either directly or as transferees, against the *428 various petitioners herein as follows: Deficiency
Deficiency
Additions
in
in
to Tax Sec.
Petitioner
Estate Tax
Gift Tax
6651(a) [2]
Estate of Carrie May
Duncan, Deceased,
Willie Cecil Montgomery
and Julian Heilbroner,
Coexecutrices,
Dkt. No. 22372-83
$93,370.95
Dkt. No. 22373-83
$52,780.00
$13,195.00
Julian Heilbroner,
Transferee of the
Assets of the Estate
of Carrie May Duncan,
Deceased, Transferor
Dkt. No. 22374-83
$93,370.95
Willie Cecil Montgomery,
Transferee of the
Assets of the Estate
of Carrie May Duncan,
Deceased, Transferor
Dkt. No. 22375-83
$93,370.95
Elvie Cobb, Transferee
of the Estate of
Carrie May Duncan,
Deceased, Transferor
Dkt. No. 11848-83
$93,370.95
$52,780.00
$13,195.00
After concessions, the issues which we must resolve are the following: 1. Whether Carrie May Duncan (decedent herein) made a taxable gift to Elvie Cobb on or about November 29, 1978, within the meaning of sections *429 2511 and 2512, and the amount thereof. 2. If so, whether decedent's estate is liable for additions to tax under section 6651(a) for decedent's failure, without reasonable cause, to file a timely gift tax return with respect thereto. 3. If a taxable gift was made under Issue 1, whether the net value of such gift is includable in decedent's gross estate for estate tax purposes under section 2035. 4. If no such taxable gift was made, whether the full fair market value of decedent's farm is includable in her gross estate under section 2033, or sections 2036 and 2043, or whether said value is controlled by a certain option agreement held by Elvie Cobb at the date of decedent's death. 5. If there is a deficiency of gift tax, interest and additions to tax, whether any such amounts should be allowed as deductions in arriving at the amount of decedent's net taxable estate under section 2053. 6. If there is a deficiency of estate tax, whether decedent's estate is entitled to a credit under section 2011 for additional state death taxes incurred with respect thereto. 7. Whether petitioners in dockets 22374-83 and 22375-83 are each individually liable, as transferees, for any *430 part of any deficiency in estate tax, together with interest, found to be due from decedent's estate, under sections 6901 or 6324. 8. Whether petitioner in docket 11848-83 is individually liable, as transferee, for any part of any deficiency in estate tax, gift tax and addition to gift tax, together with interest, found to be due from decedent's estate, under sections 6901 or 6324. Many of the facts herein were stipulated, and such stipulations, with accompanying exhibits, are incorporated herein by this reference. FINDINGS OF FACT
Petitioners herein are the Estate of Carrie May Duncan, deceased (hereinafter "the estate" and "decedent", respectively), Mrs. Willie Cecil Montgomery (hereinafter "Montgomery") and Mrs. Julian Heilbroner (hereinafter "Heilbroner"), as transferees of the estate with respect to respondent's determined estate tax liability, and Elvie Cobb (hereinafter "Cobb"), as transferee of decedent's estate both with regard to respondent's determined estate tax deficiency as well as respondent's determined gift tax deficiency and additions to tax. At the time their respective petitions were filed herein, all petitioners were residents of the State of Kentucky. *431 Decedent, who was born on June 12, 1892, died on December 13, 1979, a resident of Henderson, Kentucky. Her Last Will and Testament was duly probated thereafter in the probate courts of Kentucky, and her two sisters, Montgomery and Heilbroner, were appointed and qualified as the coexecutrices of her estate. Decedent devised and bequeathed her entire net estate in equal shares to Montgomery and Heilbroner, and each of them has received distributions of property from the estate exceeding in value the amount of estate tax liability determined by respondent against the estate and against each of them individually as transferees. Prior to her death, decedent owned a 237.4-acre farm ("the farm") located on the west side of U.S. Highway 41, in Henderson County, Kentucky, about ten miles south of the City of Henderson. The farm was conveyed to decedent and her late husband, Oscar Duncan, jointly with right of survivorship in 1967 by unrelated third parties. Oscar Duncan died on January 14, 1973, and decedent then became, by survivorship, sole owner of the farm in fee simple. In the late 1960's, Oscar Duncan had developed a 38-acre tract of the farm as a thoroughbred horse training *432 center containing, inter alia, a horse barn with 60 stalls, a 5/8's mile race track, a paddock, a lake, and a six-room farmhouse. Beginning in 1970 and up until 1975, Cobb, through his then wife, leased the training center from decedent and her husband on undisclosed terms, and operated a horse training facility there. After Cobb and his wife were divorced, and in October 1975, Cobb entered into a formal written lease (the "1975 lease") with decedent covering the horse training center portion of the farm. As material herein, that lease provided as follows: a. The initial term of the lease was for one year, with Cobb having the right to renew the lease for four successive one-year terms. b. Cobb was required to pay rental of $400 a month. Any delay in rental payments of longer than 30 days would cause a termination of the lease at decedent's option. c. Cobb was required to pay all utilities and insurance premiums for personal injury and property damage liability with respect to the lased premises, and Cobb was also responsible for current repairs and maintenance to the improvements on the leased tract. Decedent was responsible for the payment of taxes with respect to the *433 leased property, as well as the restoration of any improvements which were destroyed during the term of the lease by fire or storm. The lease contained no provisions with regard to the balance of the 237-acre farm. As to this portion, decedent had a sharecrop arrangement with a tenant farmer, one Claude Watkins, under which Watkins farmed the land, retaining for himself two-thirds of the net proceeds of the annual crops, and returning to decedent one-third of the annual proceeds. This share-crop arrangement with Watkins lasted through the year 1979. Sometime in the fall of 1978, however, decedent apparently became dissatisfied with the performance of Watkins as her tenant farmer. She complained to Cobb that payments by Watkins to her under the share-crop agreement were not only irregular but late, and that in fact Watkins had not yet paid decedent her share of the 1978 crop. At her request, Cobb went to Watkins, negotiated the matter, and apparently secured payment for decedent. Shortly thereafter, decedent told Cobb that she wanted to make a new arrangement with regard to her farm property. She expressed a desire to have a more stable and predictable income from the farm, *434 with some income from that source which she could count on in all events, for her personal financial planning purposes, and so that she would not have to go into her savings or other investments for living expenses. Her expressed concerns appeared to be twofold: she wanted to have a more predictable income from the farm, with some minimum amount guaranteed, and she wanted to divest herself of the responsibilities of managing the place. Decedent accordingly proposed to Cobb that the 1975 lease be renegotiated and expanded, and that Cobb become her manager for the farm property. After further negotiations between decedent and Cobb, which apparently all took place at decedent's home, new and expanded agreements were entered into between decedent and Cobb, and were formalized by written documents entered into between them on November 29, 1978. These documents, three in number, and a summary of their material provisions, were as follows: (1) A "lease and option" agreement (hereinafter "the 1978 option"), which contained three principal elements (a) the lease on the 38-acre horse training facility was restated to be for a term of five years, beginning October 8, 1978, giving Cobb *435 the right to renew the lease for additional five one-year terms. The rental was continued at the rate of $400 per month and the other terms of the 1975 lease were continued unchanged, except that Cobb was no longer made specifically responsible for repairs and maintenance. (b) "In consideration of the premises," Cobb agreed, upon decedent's written request, to act as her manager with respect to the entire farm for as long as decedent continued to own it, agreeing "to manage said farm in a good and workmanlike manner, returning to LESSEE [sic, should read LESSOR (decedent)] not less than one-third (1/3) of the net rents and profits or not less than the average percent of net rents and profits which LESSOR has enjoyed over the two years last past, whichever is greater." (c) "In consideration of the premises," decedent then granted to Cobb a limited option to buy the entire farm for the sum of $100,000, all cash, payable by Cobb within thirty days after the exercise of such option. Said option was exercisable by Cobb only in one of the following events: (i) During the term of the lease of the horse training facility (or any extension thereof) and during decedent's lifetime, *436 if decedent either was required to sell the property or desired to do so, decedent was required to give notice to this effect to Cobb, who would then have two weeks thereafter within which to exercise his option. (ii) In the event of decedent's death during the term of said lease, or any extension thereof, Cobb was empowered to exercise his option to purchase by giving written notice to decedent's personal representatives within thirty days of their appointment, or if no personal representatives were appointed within sixty days of decedent's death, such notice was to be given to decedent's heirs within thirty days after the close of such sixty-day period. The above agreement was made binding both upon decedent and Cobb, as well as their respective heirs, executors, administrators, successors, and assigns. (2) A "short form lease and option agreement," setting forth the essentials of the above agreement, and giving public notice of its existence, and of Cobb's rights thereunder, was duly filed among the land records of Henderson County, Kentucky. (3) Pursuant to the requirement of the "lease and option agreement," decedent executed and notarized a third document, appointing *437 Cobb to be the manager on her behalf of the farm, with full authority in the premises. This document further recited that decedent was to receive $800 per month from Cobb, which was a reference to the agreement between them that Cobb was to pay her $400 a month for the horse training facility, and a further $400 a month with respect to the balance of the farm. The second $400 monthly payment was a minimum guaranteed payment of advance by Cobb to decedent, and was creditable against the one-third annual share of the crops to which decedent was entitled under the farm management agreement, but was a guaranteed payment in all events. All the above documents were prepared by counsel, who participated in some of the negotiating discussions and advised both parties in the premises. Both decedent and Cobb were competent adults, and were aware of the legal consequences of their actions. Cobb then began operating the horse training center and the farm under the new agreements described above. For the year 1979, and until decedent's death on December 13, 1979, Cobb continued to operate the horse training center, paying decedent $400 a month rental therefor, and managed the remainder of *438 the farm, supervising the tenant farmer Watkins, and paying decedent the additional $400 per month guaranteed advance on her one-third crop share. For the crop year 1979, decedent's share of the crops was approximately $6,666, which was paid to her by Cobb, who took credit against this amount for the $4,800 guaranteed advance payments which he had already made to her. Cobb apparently received no monetary compensation for his services to decedent as her farm manager, either by way of a share of the crop or otherwise. After decedent's death, and in accordance with the provisions of the option agreement, Cobb gave written notice to the estate, exercising his option to purchase the farm for $100,000. The estate refused to honor Cobb's exercise of his option to purchase, and, in January 1980, Montgomery and Heilbroner, both individually and as coexecutrices of the estate, filed suit against Cobb in the Henderson Circuit Court in Kentucky, asking for a cancellation and recision of the 1978 agreement, including the option portion thereof. Cobb resisted this action, and filed a counterclaim in the suit, asking for specific performance of the exercise of his option to purchase the farm. *439 In February 1981, after a full and lengthy trial, the jury rendered a verdict in favor of Cobb. In accordance therewith, the Henderson Circuit Court entered judgment dismissing the complaint of the estate, and granting specific performance in favor of Cobb for the conveyance of the farm. The judgment was not appealed, and in June 1981, Montgomery and Heilbroner conveyed the farm to Cobb in accordance with the judgment of the Henderson Circuit Court. Cobb's acquaintance and relationship with decedent and her late husband, Oscar Duncan, went back many years, to when Cobb was a young man working at a local packing company. He became acquainted with Oscar Duncan through cashing his payroll checks at Oscar Duncan's nearby liquor store and bar. As the years went by, Cobb began to engage in the oil well drilling business and Oscar Duncan became a business associate of his, usually taking a one-quarter interest in every oil drilling contract which Cobb entered into. Through this relationship, Cobb came to know decedent. Later, and in the 1970's, as previously described, Cobb began renting the horse training facility portion of the farm from Oscar Duncan and, later on, from decedent. *440 Throughout all this period, their relations were apparently friendly, but businesslike, and there was no social interchange. Aside from the occasional token bottle of whiskey at Christmas time, Oscar Duncan never made any gifts to Cobb, and decedent never made any gifts of any kind to Cobb. Cobb was not related to Oscar Duncan or to decedent either by blood or marriage, and was not a natural object of decedent's bounty. No Federal gift tax return was filed by decedent or the estate with respect to the 1978 lease and option agreement between decedent and Cobb. In the Federal estate tax return filed by the estate, the farm was returned at a value of $100,000, being the value of Cobb's option price for the farm. At the date of decedent's death, as well as on November 29, 1978, the value of the farm was $270,000, [3] without considering the effect of the option agreement. ULTIMATE FINDINGS OF FACT The 1978 lease and option agreement between Cobb and decedent was entered into for full and adequate consideration. For Federal estate tax purposes, the value of the farm at the date of decedent's death was $100,000. OPINION I. The Gift Tax *441 Issues.
Respondent determined that the 1978 option constituted a taxable gift, when executed, from decedent to Cobb, being in effect a transfer of the farm to him. Petitioners deny, on various grounds, that any taxable gift took place. The parties have agreed, however, that the value of the farm was $270,000 (rather than $397,000, as originally determined by respondent), and that, if a taxable gift was made, the amount thereof was $170,000, being the difference between the stipulated value of the farm and the option price at which Cobb could purchase it, which was $100,000. The dispute between the parties on this issue involves two separate but interrelated points: (a) Petitioners contend that the limited option which decedent granted to Cobb was not "property" within the meaning of the gift tax laws and thus could not be the subject of a taxable gift. Respondent contends that the option was "property," and, in effect, was a gift of the farm itself. (b) Even if the option was "property" within the meaning of the gift tax laws, petitioners contend that its grant to Cobb was the result of an arm's-length business negotiation, supported by full and adequate consideration, *442 lacking any donative intent by decedent, and thus was not a gift. Respondent, of course, contends just the opposite. As it read in the year 1978, section 2501(a) (1) provided for the imposition of the Federal gift tax "for each calendar quarter on the transfer of property by gift during such calendar quarter by any individual, resident or nonresident." Expanding upon this language, section 2511(a) further provided that "the tax imposed by section 2501 shall apply whether the transfer is in trust or otherwise, whether the gift is direct or indirect, and whether the property is real or personal, tangible or intangible * * *." In conformity with the above language, respondent's regulations provide that "It [the gift tax] is applicable only to a transfer of a beneficial interest in property." Section 25.2511-1(g)(1), Gift Tax Regs. On the first point of contention, we think that the parties have each taken positions which are so extreme that they go wide of the mark, one on one side, one on the other. As used in section 2501, "property" is used in the broadest and most comprehensive sense, and includes every type of property having an ascertainable value which is transferable. *443 Smith v. Shaughnessy,318 U.S. 176, 180 (1943). Whether the item in question is "property," however, is a matter to be determined under state law, a point on which the parties are in agreement. Aquilino v. United States,363 U.S. 509 (1960). We first reject respondent's contention that the option which decedent granted to Cobb in 1978 constituted a transfer of ownership of the entire farm to Cobb. It is clear to us that the option gave Cobb nothing more than (a) a right of first refusal to buy the farm during decedent's lifetime, if Cobb was still decedent's tenant of the horse training facility, andif decedent should put the farm up for sale, together with (b) an option to buy the farm after decedent's death, strictly limited as to the time of exercise, and further conditioned upon Cobb still being decedent's tenant at her death. In fact, Cobb never had an opportunity to buy the farm during decedent's life.She never put the farm on the market, and died owning the place in fee simple absolute. We accordingly agree with petitioners that there was no conveyance of the farm, or any interest therein, to Cobb by virtue of the 1978 lease *444 and option agreement. See Three Rivers Rock Co. v. Reed Crushed Stone Company, Inc.,530 S.W.2d. 202, 208 (Ky. 1975); Greater Louisville First Federal Savings & Loan Association v. Etzler,659 S.W.2d. 209, 211 (Ky. Ct. App. 1983). Petitioners, on the other hand, seize upon the word "property" in the above-quoted gift tax sections of the Code, and argue that the 1978 option could not be the subject of a taxable gift, citing copious Kentucky authorities for the proposition that an option to purchase realty does not constitute a property interest in land. We do not think petitioners' premise supports their conclusion. Even accepting petitioners' contention that the 1978 option which Cobb received from decedent was not an interest in real property, we nevertheless think that, under Kentucky law, it was "property." In Commonwealth v. Kentucky Distilleries & Warehouse Co.,143 Ky. 314, 136 S.W. 1032, 1037 (1911), the Court of Appeals of Kentucky construed the concept of "property" to include * * * everything which is the subject of ownership, or to which the right of property may legally attach, or, in other words, every class *445 of acquisitions which a man can own or have an interest in. The term is therefore said to include everything which is the subject of ownership, corporeal or incorporeal, tangible or intangible, visible or invisible, real or personal, choses in action as well as in possession, everything which has an exchangeable value, or which goes to make up one's wealth or estate. Again, in Button v. Drake,302 Ky. 517, 195 S.W.2d. 66, 69 (1946), the highest court in Kentucky, in considering whether the rights of a beneficiary under a life insurance policy constituted "property," cited and quoted with approval from Commonwealth v. Kentucky Distilleries & Warehouse Co.,supra, and went on to hold that the beneficiary's rights under the life insurance policy constituted a chose in action, and thus personal property, saying, These rights undoubtedly are such that have a relation to something in contradistinction to the thing itself. They are rights which may be enforced by an action at law, consequently they must be classified choses in action. In 42 Am.Jur., under the title "Property", § 26, p. 207, it is said: "A chose in action has been defined *446 as a personal right not reduced into possession but recoverable by a suit at law. * * * a thing of which one has not the possession or actual enjoyment, but only a right to or a right to demand by an action at law. * * * a chose in action more properly includes the right both of the thing itself and of the right of action as annexed to it. * * * Choses in action are personal property, * * *. In the instant case, the option which Cobb had with relation to the farm fits the definition of a chose in action. At the time it was granted to him, Cobb received no interest or ownership in the farm itself, nor even the right to possess it. What he did get was a contract right to purchase the farm for a stated sum, and demand possession of it, upon the occurrence of certain events. That such contract right was valuable and enforceable is not to be doubted in this record, since it was vindicated by Cobb's victory in the Henderson Circuit Court in a strongly contested adversary proceeding, which enforced the option contract and decreed specific performance in Cobb's favor, as we have described in our findings of fact. It is therefore clear to us that Cobb's option right was a chose in action *447 and personal property under Kentucky law. We accordingly hold that it was "property" within the meaning of the gift tax statute, sections 2501 and 2511, and could be the proper subject of a taxable gift when transferred. We accordingly turn to the next point of contention between the parties, viz, whether the option portion of the 1978 lease and option agreement constituted a taxable gift at that time by decedent to Cobb, as contended by respondent, or whether it was a legitimate business arrangement, supported by full and adequate consideration and lacking any donative intent on decedent's part, as petitioners contend. In order to resolve this problem, we must examine the factual background and the attitudes and actions of decedent and Cobb leading up to the execution of the 1978 lease and option agreement. The record discloses that decedent, an elderly widow, had known Cobb for many years. Both she and her late husband had had business dealings with Cobb over a considerable period of time, involving not only the leasing of the horse training portion of the farm to Cobb, but also the participation by decedent's husband, Oscar Duncan, in various oil drilling ventures which Cobb *448 undertook. Over this substantial period of time, their relations were apparently friendly but always businesslike, and there was no apparent element of social friendship between the Duncans and Cobb. As a result of this long-term association, decedent apparently acquired confidence in Cobb's honesty and business ability. In the fall of 1978, Cobb was the lessee of the 38-acre horse training facility on the farm, as he had been for a number of years, but had no official connection with the rest of the place. As to this remaining portion, decedent had a typical share-crop arrangement with a tenant farmer, under which the tenant farmed the land, retained two-thirds of the crop, and remitted the proceeds of one-third to decedent as the landlord. Decedent had already had some difficulty with the tenant farmer, with respect to the amount and promptness of his payments, and had sought Cobb's help in getting the matter straightened out. In November of 1978, she approached Cobb, and indicated she was dissatisfied with the existing arrangement with regard to the farm. She indicated that she no longer wanted to have the responsibility for farming the place, in view of her age, but she *449 also wanted to be assured of a steady and dependable income from the farm, to meet her present and anticipated future living expenses. She accordingly proposed to Cobb that the existing lease on the horse training facility be expanded from a one-year term to a five-year term, with certain rights of renewal, but at the same rent, and she further proposed that Cobb become her manager for the remaining portion of the farm, doing whatever was necessary to manage the place properly, and returning to her the one-third crop share which she had previously been receiving, but with a minimum guaranteed amount of $400 a month therefrom, or $4,800 annually. She then offered to give Cobb a right of first refusal to purchase the farm during her lifetime, if he was still her tenant and if she ever put the farm up for sale, with a further option to Cobb to purchase the farm if he was still her tenant at the time of her death. In either event, the price to be paid was to be $100,000, all cash. After further negotiations between decedent and Cobb, in which counsel participated, the 1978 lease and option agreement was executed along these lines, as detailed in our findings of fact. [4]
*450 In all the above, we discern no element of donative intent on the part of decedent, but rather the desire of an elderly widow to free herself of the management responsibilities of the farm, and to provide a reasonable and assured competence for her present and anticipated future living expenses. These are attitudes which are associated with life, not with death. Although decedent was an elderly woman, we find nothing in this record to indicate that she was suffering from any terminal illness, or that she anticipated her early demise. Rather, she was planning for her future life. This brings up the question of the adequacy of the consideration which Cobb gave for his option. Respondent urges that Cobb in effect gave nothing for the option agreement; petitioners urge that the parties, both competent adults and dealing at arm's length, entered into a valid and reasonable business arrangement which should be recognized as such, regardless of later events. We agree with petitioners. We think that the agreements which decedent and Cobb entered into in November 1978 were interdependent and must be considered as a whole. In doing so, we concentrate upon the lease and option agreement, *451 and the written designation of Cobb to be petitioner's farm manager. [5] From the standpoint of consideration furnished to decedent by Cobb, we take into consideration the following: (a) The previous 1975 lease agreement covering the 38 acre horse training facility was modified so as to give Cobb a five-year term, with rights of renewal, rather than a one-year term, with renewal rights. In one sense, this may be said to have been a benefit to Cobb, since he thereby secured a longer lease. On the other hand, it is equally reasonable to say that it constituted a benefit to decedent, since she thereby secured a tenant, with an assured rent, for a longer period of time. (b) Cobb agreed, for as long as decedent should continue to hold title to the farm, to act as decedent's farm manager, paying to decedent one-third of the proceeds of the annual crops, "or not less than the average percent of net rents and profits which lessor has enjoyed over the two years last past, whichever is greater." In all events, Cobb had to pay decedent $400 a month as a guaranteed minimum under the farm management arrangement, whether there was any crop share to be paid to decedent or not, and there was no *452 provision for any financial compensation of any kind to Cobb in return for his services as the farm manager. Respondent makes light of this provision, asserting that prior history showed that decedent's one-third share of the crop would always be more than Cobb's annual guarantee of $4,800, and that Cobb risked nothing under this arrangement. We do not agree. With farming being the risky business that it is, it was entirely possible in any given year that the crop might be wiped out by fire, flood, drought, storm or pestilence, but Cobb would remain liable to decedent for the annual guaranteed $4,800 payment, or decedent's average one-third share for the preceding two years, whichever was greater. Furthermore, as long as the existing and customary share-crop arrangement was maintained with the tenant farmer, who took a two-thirds share of the crop, there was no possibility whatever for Cobb to derive any compensation for his managership. The *453 entire proceeds of the crop would go to the tenant farmer and to decedent. The only way Cobb could get any monetary reward would be to farm the place himself, and there is no indication in this record that either decedent or Cobb had any such expectation. Cobb further carried the risk of making full and timely collections of crop proceeds from the tenant, who apparently had not been too dependable in the past. Cobb thus bound himself to this arrangement, without any prospect of direct financial reward, for an indefinite period in the future, viz, for as long as decedent continued to own the property. He made himself responsible for the grunts and the squeals, without having any ownership of the pig. Had decedent lived a long time, it might have been a tedious road indeed for Cobb. "In consideration of the premises," decedent gave Cobb the option which is the subject of the dispute herein. Those "premises" clearly included the obligations which Cobb had undertaken under the farm management provisions of the agreement and, viewed as of the time the agreement was entered into, we think this consideration was substantial. No one knew at that time that decedent would die just a *454 year later. That event indeed was a windfall for Cobb, in that he was then able to exercise his option to purchase the farm at a price far below its agreed true value. That subsequent event, however, was something which was unknown to the parties at the time, and could not reasonably be foreseen. [6]
Thus, as later events transpired, it could be argued, as respondent does with the benefit of hindsight, that the consideration furnished by Cobb for the option to buy the farm at a bargain price was inadequate, but that is not the test to be applied here. Where the facts show, as here, that the arrangement was entered into at arm's length for business purposes and without donative intent, and that Cobb was not the natural object of decedent's bounty, the fact that decedent may, in retrospect, have made a bad bargain does not transform a business transaction into a taxable gift. Weller v. Commissioner,38 T.C. 790 (1962); Hull v. Commissioner,T.C. Memo. 1962-199. Respondent himself has recognized *455 the realities of situations such as this. Section 25.2511-1(g)(1) of respondent's Gift Tax Regulations provides, in pertinent part: However, there are certain types of transfers to which the tax is not applicable. * * * The gift tax is not applicable to a transfer for a full and adequate consideration in money or money's worth, or to ordinary business transactions, described in section 25.2512-8. In pertinent part, section 25.2512-8 of respondent's Gift Tax Regulations further provides: Transfers reached by the gift tax are not confined to those only which, being without a valuable consideration, accord with the common law concept of gifts, but embrace as well sales, exchanges, and other dispositions of property for a consideration to the extent that the value of the property transferred by the donor exceeds the value in money or money's worth of the consideration given therefor. However, a sale, exchange, or other transfer of property made in the ordinary course of business (a transaction which is bona fide, at arm's-length, and free from any donative intent) will be considered as made for an adequate and full consideration in money or money's worth. * * * We have previously *456 recognized and approved this exception to the general rules for the determination of taxable gifts. Gross v. Commissioner,7 T.C. 837 (1946); Jones v. Commissioner,1 T.C. 1207 (1943). We conclude here that the granting by decedent to Cobb of an option to purchase the farm was part of an arm's-length business transaction, entered into between parties who were competent and for valid business purposes, with no element of donative intent on decedent's part, and we accordingly hold that no taxable gift took place. [7]
II. The Estate Tax Issues.
In support of his determination of an estate tax deficiency against the estate, and against the individual petitioners as transferees, respondent advances three alternative theories: (a) That the full value of the farm, stipulated *457 to be $270,000, should be included in decedent's taxable estate under section 2035 as a gift made within three years of decedent's death, less the $100,000 option price, which should be included as an asset of the estate under section 2033; or (b) that the full value of the farm should be included in decedent's gross estate under section 2036, less the $100,000 option price, on the theory that decedent had made a transfer of the farm during her lifetime for inadequate consideration, retaining a life estate therein, under the provisions of section 2036, with the $100,000 option price again being includable as an asset of the estate under section 2033; or (c) that the full stipulated value of the farm, in the amount of $270,000, is includable in decedent's gross estate under the provisions of section 2033, without giving effect to the option contract, which gave Cobb the right to purchase for $100,000. Respondent's first two alternative theories may be quickly disposed of. Since, as we have held, there was no transfer of the farm, or any interest therein, by decedent during her lifetime, and since we have held that the only thing that was transferred during decedent's lifetime *458 was the option contract, which was granted to Cobb for full and adequate consideration, sections 2035 and 2036 have no application herein, and need not be further discussed. We accordingly turn to respondent's final theory, and the more serious question whether the option held by Cobb operates to reduce the value of the farm to the option price of $100,000 for Federal estate tax purposes. In Estate of Bischoff v. Commissioner,69 T.C. 32 at 39 (1977), we quoted with approval and applied the rule enunciated some years before in Estate of Weil v. Commissioner,22 T.C. 1267, 1273 (1954), as follows: It now seems well established that the value of property may be limited for estate tax purposes by an enforceable agreement which fixes the price to be paid therefor, and where the seller if he desires to sell during his lifetime can receive only the price fixed by the contract and at his death his estate can receive only the price theretofore agreed on. Estate of Albert L. Salt,17 T.C. 92; Lomb v. Sugden,82 F.2d 166; Wilson v. Bowers,57 F.2d 682. In the application of the above proposition, the *459 following tests have evolved: 1. In order to be effective for fixing the value of an asset for Federal estate tax purposes, the agreement in question must be binding both during life and at death. Wilson v. Bowers,57 F.2d 682 (2d Cir. 1932); Brodrick v. Gore,224 F.2d 892, 896 (10th Cir. 1955); Fiorito v. Commissioner,33 T.C. 440 (1959). Strictly speaking, what was present in the instant case was a right of first refusal during decedent's life, coupled with a true option at decedent's death, both being contingent upon Cobb still being decedent's tenant at that time. Be that as it may, it is clear that there were substantial restrictions on the ability of decedent or her estate to sell the farm for more than $100,000, either during decedent's life or after her death. The parties agree that such restrictions existed in this case; we agree also, and therefore do not need to consider this question further. 2. The second test is that the restrictive agreement which is claimed to be controlling for estate tax valuation purposes must have been one which was entered into for bona fide business reasons, at arm's length, and must *460 be found not to be a substitute for a testamentary disposition to a person who is the natural object of the grantor's bounty. See St. Louis County Bank v. United States,674 F.2d 1207 (8th Cir. 1982). We have already discussed this aspect to the case more fully above herein, and we see no need to repeat what was said there. We are satisfied that the option agreement of 1978 which was entered into between decedent and Cobb (being part of a larger package of contractual commitments) was entered into at arm's length by decedent and Cobb for reasons which were valid life oriented business reasons, were entirely reasonable in the circumstances, and were entered into by decedent with a person (Cobb) who was not related by blood or marriage to decedent and was not a natural object of her bounty. See sections 20.2031-2(h) and 20.2031-3, Estate Tax Regulations. 3. Finally, the agreement must be valid and enforceable, which contemplates that it must have been granted for full and adequate consideration. Here again, as our discussion above herein shows, there was full and adequate consideration for the option which decedent granted to Cobb, and the agreement was specifically *461 enforced in his favor by the Henderson Circuit Court in a full adversary law suit. We accordingly conclude that all the necessary tests have been met which would call for the instant option agreement to be controlling for the purposes of valuing the farm in decedent's gross estate at a value of $100,000, and we accordingly hold for the petitioners. Having arrived at these conclusions, the other issues presented in this case become moot and need not be considered further. To reflect the foregoing, Decisions will be entered for the petitioners.
Footnotes
1. Cases of the following named petitioners were consolidated herewith for purposes of trial, briefing and opinion: Estate of Carrie May Duncan, Deceased, Willie Cecil Montgomery and Julian Heilbroner, Coexecutrices (Docket Nos. 22372-83 and 22373-83); Julian Heilbroner, Transferee of the Assets of the Estate of Carrie May Duncan, Transferor (Docket No. 22374-83); and Willie Cecil Montgomery, Transferee of the Assets of the Estate of Carrie May Duncan, Transferor (Docket No. 22375-83).↩
2. All statutory references are to the Internal Revenue Code of 1954, as in effect in the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
3. So stipulated by the parties.↩
4. In considering the nature of the option agreement, we have considered the testimony of Cobb with respect to statements made and positions taken by decedent in the negotiations leading up to the execution of the 1978 agreements. Respondent, both at trial and on brief, objected to such testimony being received, on the grounds that it was inadmissible hearsay under Fed. R. Evid. 801 and 802, and was not within any of the exceptions of Fed. R. Evid. 803 or 804, although, as respondent conceded in his reply briefs, the question was largely academic, since much of the same material was contained in other evidence which the parties had stipulated. We think the evidence was properly received. What is at issue here is the nature and legal significance of the 1978 option agreement: was it a business arrangement or was it a gift? The written document in evidence may be construed either way on this question, and thus is ambiguous. As in the case of most contracts, therefore, the contemporaneous acts and statements of the moving parties can be of assistance in determining the nature and character of the transaction (without in any way varying the terms of the contract in violation of the parol evidence rule). Such contemporaneous positions and statements of the parties are therefore considered as verbal acts, or verbal parts of an act which is both spoken and written, and are not excluded under the hearsay rule. The witness Cobb having heard the words, he could testify that they had been spoken. NLRB v. Tex-Tan, Inc.,318 F.2d 472, 483 (5th Cir. 1963); Creaghe v. Iowa Home Mutual Casualty Co.,323 F.2d 981, 984 (10th Cir. 1963); Wigmore on Evidence (Chadbourn Rev. 1976), secs. 1770, 1772, 1777. With due deference to Prof. Wigmore, who much maligns the phrase, Wigmore, supra,↩ sec. 1767, we think that the testimony here was admissible because, as verbal parts of an act, it was truly part of the res gestae - the option contract whose character is the subject of the present dispute.
5. The third contemporaneously executed document, the "short form lease and option agreement," which was publicly recorded, was simply a brief restatement of the lease and option provisions, and need not be referred to further herein.↩
6. "Death is the ugly fact which Nature has to hide, and she hides it well." Alexander Smith, Dreamthorp, Of Death and the Fear of Dying (1863).↩
7. Having so concluded, we need not consider a further potential issue which could arise if we had held that the transfer here was not↩ supported by full and adequate consideration, viz, whether a completed gift took place in 1978, in view of the contingencies in Cobb's right of first refusal. See sec. 25.2511-2, Gift Tax Regs. In any case, neither party raised the issue.