ESTATE OF JOSEPH H. LAUDER, DECEASED, LEONARD A. LAUDER AND RONALD S. LAUDER, EXECUTORS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Lauder v. Commissioner
Docket No. 21525-87
United States Tax Court
T.C. Memo 1990-530; 1990 Tax Ct. Memo LEXIS 584; 60 T.C.M. (CCH) 977; T.C.M. (RIA) 90530; October 9, 1990, Filed Ira T. Wender, Theodore B. Van Itallie, Jr., Stephen P. Younger, and David J. Wilfert, for the petitioner. Eugene J. Wien and James P. Clancy, for the respondent. HAMBLEN, Judge. *
HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION This matter is before the Court for our determination of the status of the health of Joseph H. Lauder, deceased, at the time he entered certain agreements hereinafter designated and for the Court to consider and act upon petitioner's motion for partial *585 summary judgment pursuant to Rule 121. [1] Following the determination of the status of decedent's health, we then must determine (1) whether or not a motion for summary judgment is appropriate and (2) if so, whether the terms of a shareholders agreement controlled the valuation of shares of stock in a closely held corporation for purposes of Federal estate tax. Joseph H. Lauder, a resident of New York State, died on January 16, 1983, at age 81. Joseph Lauder's sons, Ronald S. Lauder and Leonard A. Lauder, were duly authorized as executors of his estate. Petitioner, the estate of Joseph Lauder, filed a timely estate tax return on April 16, 1984. By statutory notice of deficiency dated April 6, 1987, respondent determined a deficiency in petitioner's estate tax in the amount *586 of $ 42,702,597.67. A significant portion of this deficiency is attributable to respondent's determination that the value of the shares of stock owned by the decedent at the time of his death was $ 13,250 per share rather than $ 4,111 per share as calculated by petitioner. [2]
Petitioner filed a motion for partial summary judgment on October 4, 1988, to which respondent objected on December 12, 1988. After the parties exchanged reply briefs and supplemental memoranda, the matter was argued by counsel and heard by the Court on March 1, 1989. At this hearing the issues were narrowed to (1) whether the parties knew when the agreement was executed that it would not be enforced and (2) the state of Joseph Lauder's health in the determination *587 of whether or not the arrangement was a substitute for testamentary disposition. Following depositions of Estee Lauder, Ronald Lauder, and Leonard Lauder as suggested by the Court and stipulated to by the parties, a hearing was held in New York City on March 8, 1990, with respect to the status of decedent Joseph H. Lauder's health. At the hearing, the Court asked respondent's counsel: "This is the one factual issue, isn't it?", with respect to the decedent's health as opposed to the other material in connection with the motion for partial summary judgment. Respondent's counsel replied: "The one factual issue in dispute, that's all." We shall address first the issue of decedent's health at the time the agreement was entered into. Health Status of Joseph H. Lauder, Deceased
At the hearing in New York, the Court heard testimony and received expert reports from, and briefs were submitted and exchanged by, both parties. We resolve that issue by our findings herein and then proceed to consider the motion for partial summary judgment. In resolving the issue concerning Joseph H. Lauder's health, we reviewed reports submitted by, and heard the testimony of, each of petitioner's *588 experts, Dr. Gertler and Dr. Rosenfeld, and each of respondent's experts, Dr. Steremberg and Dr. Cohen. Decedent was not a regular patient of Dr. Gertler, and neither Dr. Steremberg nor Dr. Cohen ever observed or treated the decedent as a patient or otherwise. However, Dr. Rosenfeld was the decedent's personal physician and he personally examined and treated decedent for many years. While we found each of the experts well qualified, we gave more weight to Dr. Rosenfeld's observations and determinations as he was responsible for decedent's health maintenance and his opinion was consistent with that of others who knew and observed decedent personally. We are convinced decedent was not suffering from and was neither aware nor apprehensive of any terminal illness or impending fatality during the period preceding and at the time of the execution of the Shareholder's Agreement before us. The first of the agreements before the Court in connection with the petitioner's motion for partial summary judgment was executed in 1974. Joseph Lauder, who was born in 1902, enjoyed comparatively good health in the years preceding 1974. During those years, Joseph and Estee Lauder spent half of *589 each year in New York and the other half in Florida. When they were in New York, Joseph Lauder worked at his office in the Estee Lauder, Inc. (ELI) plant in Melville, New York, nearly every day. Each day in Melville, Joseph would walk all around the plant to check operations. He also handled paperwork and attended meetings. Joseph and Estee Lauder spent the remainder of the year in Florida, but Joseph Lauder kept in daily telephone contact with the employees in the Melville plant. Occasionally, Joseph Lauder visited the corporation's plants in England, Belgium, and Switzerland where he would usually want to walk around the entire plant, a two-hour undertaking. Then he would meet with the local management and personnel for the remainder of the day and for dinner. Robert Wright and John Chilton, employees of ELI, described Joseph Lauder as energetic and actively involved in supervising daily manufacturing operations until the time of his death. From 1974 until 1983 when he died, Joseph Lauder was treated by Dr. Isadore Rosenfeld in New York City. Dr. Rosenfeld noted that Joseph Lauder generally appeared to feel fine and seemed happy and energetic. Dr. Rosenfeld determined that *590 Joseph Lauder had a dilated aorta, but because this was not unusual for his age and was not life threatening, Dr. Rosenfeld did not inform Joseph Lauder about it. The dilated aorta, also referred to as a tortuous aorta or an aneurismal tortuous aorta, was asymptomatic, and Dr. Rosenfeld was confident that, if it did not grow rapidly, it would not be dangerous to the patient. Prior to Joseph Lauder's initial visit to Dr. Rosenfeld in 1974, he had suffered from prostate trouble, for which he had an operation that resolved the problem. He also suffered from an anal ulcer, which did not recur, and phlebitis, a fairly common side effect of surgery. Joseph Lauder's phlebitis reappeared several times, and at each time he was found to have high blood pressure that disappeared after the phlebitis was treated. On several occasions Joseph Lauder was hospitalized in Europe, suffering from high blood pressure. Dr. Rosenfeld was not concerned about these temporary bouts of high blood pressure, believing them to have been caused by the phlebitis or by stress resulting from hospitalization. Throughout his treatment of Joseph Lauder, Dr. Rosenfeld recorded that his blood pressure, heart performance, *591 and lung capability were all well within normal limits. Although Dr. Rosenfeld noted that Joseph Lauder's heart was enlarged, a condition known as cardiomegaly, he declared that the heart's size was within normal limits for a man of Joseph Lauder's age and was not problematic. Dr. Rosenfeld concluded that Joseph Lauder did not suffer from hypertension because each time his blood pressure was elevated for a significant period of time it was related to external stress. Dr. Rosenfeld never gave Joseph Lauder any reason to believe that he was ill or close to death. In 1981, while attending the Bircher-Benner Clinic, a spa in Switzerland, Joseph Lauder was diagnosed as having an aneurysmal dilatation of the aorta and coronary heart disease. Dr. Gertler, Estee Lauder's physician, and Dr. Rosenfeld discussed the Bircher-Benner report with Joseph Lauder reassuring him that he was not close to death. After considering evidence presented by both parties, we have concluded that Joseph Lauder was not aware of having a life-threatening illness or condition in either 1974 or 1976, if, indeed, he had such an illness. Although several doctors testified about Joseph Lauder's health during the *592 early and mid-1970's, the testimony of his primary care physician, Dr. Rosenfeld, was the most significant to us. During that period, Joseph Lauder felt healthy and fit and was working as hard as a much younger man. Based upon the overall evidence, and relying more on the testimony and opinion of those who treated and knew the decedent personally, we conclude that Joseph Lauder was not in precarious or poor health in either 1974 or 1976, the pertinent times herein, but was in fair health and that for his age his health problems were rather normal and not life-threatening. Motion for Summary Judgment
The following facts are based upon the pleadings, affidavits, depositions, and other pertinent material in the record. See Rule 121(b). They are stated solely for purposes of deciding petitioner's motion for summary judgment, and not as findings of fact in this case. Rule 52(a), Federal Rules of Civil Procedure. At the time of his death, Joseph Lauder owned 760 shares of common voting stock and 5,996 shares of common nonvoting stock in EJL Corporation (EJL or the corporation). EJL, a holding company incorporated in Delaware, is the sole shareholder of Estee Lauder, Inc. *593 (ELI), Clinique Laboratories, Inc. (Clinique), Prescriptives, Inc. (Prescriptives), and Aramis Inc. (Aramis), which are all engaged in the manufacture and distribution of cosmetics, perfume, and related products. As of January 16, 1983, the EJL common stock was owned as follows: Number of
Voting
Number of
Shareholder
Voting Shares
Percentage
Nonvoting Shares
Estee Lauder
2,546
67% 7,684
Joseph Lauder
760
20% 5,996
Leonard Lauder
247
6.5%
5,614
Ronald Lauder
247
6.5%
5,614
Trust for
Grandchildren [3]
-0-
-0- 4,100
From its inception the corporation has had preferred shareholders who are not Lauder family members. Throughout the history of the corporation, the Lauder family has exercised sole control. The business was started by Joseph and Estee Lauder just after World War II. At the time of trial, Estee Lauder served as chairperson of the board of directors of both *594 the corporation and ELI. Until his death, Joseph served as executive chairman of the board of directors of the corporation and supervised the manufacturing operations. Leonard Lauder joined the corporation in 1958 after graduating from the University of Pennsylvania and serving in the U.S. Navy. Ronald Lauder joined the corporation after graduating from the Wharton School of the University of Pennsylvania, serving in the Coast Guard, and studying business administration for a year at the University of Brussels. At the time of trial, Ronald Lauder was president and chief executive officer of Lauder Investments, Incorporated, a subsidiary of the corporation. Leonard Lauder was president of the corporation and president and chief executive officer of ELI. Leonard's wife, Evelyn Lauder, has been employed by the corporation as training director, new products director, and public relations director and was a vice president at the time of trial. Leonard Lauder has served as director of the corporation during all pertinent years. While a director of the corporation, Ronald Lauder was the Deputy Assistant Secretary of Defense for NATO Affairs from January 1983 to April 1986. When Ronald *595 Lauder was appointed U.S. Ambassador to Austria in April of 1986, he resigned his position on the board of directors of the corporation as required by Federal law. After his tenure as ambassador, Ronald Lauder again became a director of the corporation in November of 1987. In the 1950's the Lauders declined an attractive offer for the entire business from Sam Rubin, of Faberge. In the early 1970's, after a period of rapid corporate expansion, the family members again considered placing the corporation's stock on the public market to achieve financial security and stability, but decided not to. Originally, ELI was the parent company. On May 28, 1974, ELI and the four shareholders, Joseph, Estee, Ronald, and Leonard Lauder, executed a shareholder's agreement to restrict the transferability of the common stock of ELI (the 1974 Shareholder's Agreement). The stated purpose of the 1974 Shareholder's Agreement was to "Assure the continued management of the Corporation by restricting the privilege of ownership of the capital stock of the Corporation." The 1974 Shareholder's Agreement provided that a shareholder who wanted to dispose of his stock, or whose stock was subject to transfer *596 by operation of law, was obliged to inform the corporation before disposing of the stock. The other shareholders could purchase the selling shareholder's shares in proportion to their then current holdings at a price derived by prearranged formula within a period of 60 days. If a shareholder did not purchase his full proportionate number of shares, those unsold shares would be offered to the other shareholders in proportionate allocations. Any shares still unsold at the end of 60 days could be purchased by the corporation. If more than 50 percent of the voting stock was for sale, the corporation was required to purchase all of the unpurchased voting shares. These restrictions applied to testamentary as well as to inter vivos transfers. Additionally, if, for any reason other than death, a shareholder terminated his employment with the corporation, including serving on the board of directors, the 1974 Shareholder's Agreement provided that his shares would be sold to the remaining shareholders. The 1974 Shareholder's Agreement sets forth the formula for determining the purchase price of the stock (referred to as the book value formula). The basis of the formula is the book value *597 of the stock, excluding the value of intangible assets, as determined in the last audited annual statement preceding the date of the selling shareholder's notice to the corporation, the date of the selling shareholder's death, or the date of the selling shareholder's employment termination. That value is then reduced by the amount of all dividends paid with respect to the offered shares between the last audited statement date and the sale. Finally, the amount is adjusted to reflect the corporation's receipt of any tax refund or prepayment of tax that has not been entered upon the corporation's books by the date the offered shares are valued. According to the affidavits the book value formula was chosen because the shareholders discovered that the Standard & Poor's 400 indicated that stocks were selling for approximately the value of their book value amounts. In fact, the separate listing for cosmetics companies in Standard & Poor's 400 showed that book value was only a third of market value, but according to the affidavits the shareholders were not aware of this portion of the Standard & Poor's 400. For businesses in general, the Standard & Poor's 400 established that book value *598 approximated market value. The 1974 Shareholder's Agreement indicated that the stock could be paid for in cash or debentures. The debentures would have a 10-year life and would bear an interest rate of 4 percent. The 1974 Shareholder's Agreement stated that its terms were final and binding upon all parties, and, further, that the restrictions were to be written on each certificate of stock. The 1974 Shareholder's Agreement could only be terminated with the consent of all shareholders and the corporation. After the 1974 Shareholder's Agreement was executed, Joseph and Estee Lauder executed codicils to their wills that eliminated their direct bequests of ELI stock to Ronald Lauder. In 1976, ELI was reorganized and all the stock was transferred to EJL. On December 14, 1976, the shareholders of EJL, Joseph, Estee, Ronald and Leonard Lauder, and the corporation executed a new Shareholder's Agreement (the 1976 Shareholder's Agreement; hereinafter both the 1974 Shareholder's Agreement and the 1976 Shareholder's Agreement will be referred to collectively as the Shareholder's Agreement unless a distinction is necessary). Although the 1976 Shareholder's Agreement was substantially *599 the same, there were several new provisions. A difference between the 1976 Shareholder's Agreement and its predecessor is that under the 1974 Shareholder's Agreement, the shares were first offered to the shareholders and then to the corporation, but the 1976 Shareholder's Agreement reversed the order, giving the right of first refusal to the corporation. If, however, the offered stock represented more than 50 percent of the Corporation's voting power, the corporation was obliged to purchase it. The 1976 Shareholder's Agreement provided for the transfer of shares to nonshareholders with the written consent of the Corporation only after the prospective shareholder agreed to be bound by the terms of the 1976 Shareholder's Agreement. The 1976 Shareholder's Agreement limited the automatic forfeiture of stock on the termination of employment to the four Lauder shareholders. On April 18, 1986, the Shareholder's Agreement was amended to provide that a shareholder who terminated his employment with the corporation in order to accept an elected position or an appointment to a position in public service would not have to sell his stock to the corporation as provided in the Shareholder's *600 Agreement. By affidavit, respondent introduced the opinion evidence of Robert F. Reilly (Reilly), an expert in the valuation of stock in cosmetics companies. Reilly analyzed the relationship between the formula price and the fair market value of the corporation's stock on December 14, 1976. Reilly found that, in 1976, publicly traded cosmetics companies with "investment similarity" to ELI were sold for approximately 12 times earnings and two times book value. Because the book value of ELI stock was only four times earnings in 1976, Reilly concluded that the book value formula price represents only between a half and a third of the real value of ELI and attributed the discrepancy to the value of the intangible assets. Reilly made no adjustments for lack of control or lack of marketability. The determination of value set forth in the statutory notice of deficiency was based on Reilly's conclusions. On December 15, 1976, the Lauders transferred a total of 4,100 shares of EJL nonvoting common stock to trusts maintained for the benefit of the children of Ronald and Leonard Lauder (hereinafter referred to as the grandchildren). The corporation and shareholders waived their rights *601 to purchase the stock and the trustees agreed to be bound by the terms of the Shareholder's Agreement. Also on December 15, 1976, Joseph, Estee, Leonard, and Ronald Lauder transferred EJL nonvoting common stock to the University of Pennsylvania (the University) in the amounts of 540, 810, 375, and 375 shares, respectively. Both Leonard Lauder and Ronald Lauder were graduates of the University. Pursuant to these transfers, the corporation and the shareholders waived their purchase rights provided by the Shareholder's Agreement and the University agreed to be bound by the terms of the Shareholder's Agreement. Subsequently, the University wanted to dispose of its shares and, on June 26, 1981, the University's shares were purchased by the corporation at a price of $ 2,947.01 per share, as calculated using the book value formula from the Shareholder's Agreement. As we have previously determined, Joseph Lauder's health was fairly normal in 1974 and 1976. In 1974, Joseph Lauder was 72 and he did not die until some nine years later when he was 81. After Joseph Lauder's death, his executors offered his 6,756 shares of stock to the corporation. The corporation purchased all the stock *602 at a price of $ 4,111 per share, using the book value formula. The book value formula based the $ 4,111 price per share on the audited annual statement for the fiscal year ended June 30, 1982, prepared by the accounting firm, Arthur Andersen & Co. The price reflects an adjustment for dividends in the amount of $ 189 per share paid after June 30, 1982. On petitioner's estate tax return, the value of the EJL stock was listed at $ 4,300 per share at the time of Joseph Lauder's death. In the notice of deficiency, respondent valued the EJL stock at $ 13,250 per share, resulting in a net deficiency of $ 42,702,597.67. [4]
Property is included in the gross estate at its fair market value, which is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge *603 of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs.; United States v. Cartwright, 411 U.S. 546, 551 (1973). The "willing buyer and willing seller" concept is hypothetical and is tested on the basis of hypothetical parties, not parties to the litigation. Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981). If the property is stock that is not listed on an exchange and cannot be valued with reference to bid and asked prices or historical sales prices, the value of stock in comparable corporations engaged in the same or a similar line of business must be considered. Sec. 2031(b). The determination of the fair market value of property is a question of fact. Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. a Memorandum Opinion of this Court. The fair market value of closely held stock may be established for purposes of estate tax by an enforceable agreement that fixes the price at which a willing seller would part with his interest during his lifetime, provided that his estate can receive only the price set by the agreement for the stock after his death and the agreement is not a substitute *604 for testamentary disposition. Lomb v. Sugden, 82 F.2d 166 (2d Cir. 1936); Wilson v. Bowers, 57 F.2d 682 (2d Cir. 1932); Estate of Bischoff v. Commissioner, 69 T.C. 32 (1977). Several requirements have evolved for testing the enforceability of options and contracts to purchase. In order to establish the value for estate tax purposes, the price must be readily determinable under the terms of the agreement, and the agreement must be binding both during life and after death. United States v. Land, 303 F.2d 170 (5th Cir. 1962); Brodrick v. Gore, 224 F.2d 892, 896 (10th Cir. 1955); Fiorito v. Commissioner, 33 T.C. 440 (1959). If the decedent is entitled to dispose of the stock or security at any price he chooses during his lifetime, the agreement will not be considered effective. Sec. 20.2031-2(h), Estate Tax Regs. Additionally, the restrictive agreement must have been entered into for bona fide business reasons, and must not be a substitute for testamentary disposition. These last two factors are conjunctive and both must be satisfied. St. Louis County Bank v. United States, 674 F.2d 1207 (8th Cir. 1982). *605 As the regulations explain: Even if the decedent is not free to dispose of the underlying securities at other than the option or contract price, such price will be disregarded in determining the value of the securities unless it is determined under the circumstances of the particular case that the agreement represents a bona fide business arrangement and not a device to pass the decedent's shares to the natural objects of his bounty for less than an adequate and full consideration in money or money's worth. [Sec. 20.2031-2(h), Estate Tax Regs.] Based upon the foregoing, we focus on the issue of whether the agreements were a device to pass the decedent's shares to the natural objects of his bounty for less than an adequate and full consideration in money or money's worth. This issue encompasses the intent of the parties when they entered into the agreements, i.e., whether they knew at that time the agreements would or would not be enforced as an element of testamentary intent to pass the ownership of the enterprise to the normal objects of Joseph Lauder's bounty under an artificial and arbitrary advantage. We determine that there are insufficient facts before us upon which *606 to base an appropriate conclusion of the factual issue of testamentary intent which is the second prong of the test in St. Louis County Bank, supra, and the regulations. Under Rule 121(b) summary judgment is appropriate "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be entered as a matter of law." See Naftel v. Commissioner, 85 T.C. 527, 529 (1985); Jacklin v. Commissioner, 79 T.C. 340, 344 (1982). The moving party bears the burden of proving that no genuine issue exists as to any material fact, and that he is entitled to judgment on the substantive issues as a matter of law. See Espinoza v. Commissioner, 78 T.C. 412, 416 (1982). In deciding whether to grant summary judgment, we view the factual material and inferences drawn from it in the light most favorable to the party opposing the motion. Naftel v. Commissioner, supra.
Some of the facts have been stipulated and can be found as stipulated, including attached exhibits, *607 which are incorporated herein by this reference, and there are other matters in the record from which the foregoing factual outline is based. However, respondent raises several issues which we feel require us to go beyond the factual material in the record and which require further amplification in order to arrive at a meaningful conclusion. In this respect, construing the material in a manner most favorable to respondent, we cannot conclude that the transaction was a substitute for testamentary disposition, nor could we rule as a matter of law that it was not a substitute for a testamentary disposition based upon the factual material presented by petitioner. There simply is not enough in the record to infer, one way or another, that the agreements were or were not testamentary substitutes. Suspicion or conjecture is not a basis for an appropriate inference. We have determined that the health of the decedent Joseph Lauder is not an issue, but there are several contentions espoused by petitioner and respondent which we think require further factual amplification in order for a proper determination to be made in applying long-established principles pertinent to this case. Considering *608 the codicils to the wills of Joseph and Estee Lauder, the fact that Ronald and Joseph Lauder were the natural objects of their bounty, that discussions about public offerings of the organization's shares which would produce relevant information as to value were discussed by all concerned, and several other factors, we are led to conclude that further factual development is necessary to determine whether or not a testamentary disposition was the intention of the parties here. We are not unmindful of the long established precedents in this area, going all the way back to May v. McGowan, 194 F.2d 396 (2d Cir. 1952), and beyond, recognizing the utility and merit of such arrangements in maintaining family ownership and control of a business organization. However, with respect to the issue of whether or not the agreements are substitutes for a testamentary disposition, we need further amplification as to what consideration, if any, was taken into account other than the mutuality of covenants and restrictions. A better development of the facts is required to determine whether or not the agreements were created other than for the business purpose purported in the agreements. *609 The problem before us as to this motion for partial summary judgment is the tension between the burden placed upon respondent by Rule 121(d) to come forth with some factual material to counter what petitioner considers to be a prima facie case, and the burden of proof which is on petitioner. See Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). In the scenario before us, as we have stated, there just is not adequate factual background for us to determine the issue of testamentary disposition one way or the other. In this respect, we suggest that the rule which favors summary judgment must give way in the context of an intensely factual situation to the need for a trial where the facts can be established fully. As one court has stated it: "Any rule that impedes the discovery of truth in a court of law impedes as well the doing of justice." Hawkins v. United States, 358 U.S. 74, 81 (1958) (Justice Stewart concurring). See United States v. Piccinonna, 885 F.2d 1529, 1535 (11th Cir. 1989) (en banc). In order for us to get to the truth of the matter before us we need to have a more thorough development of the facts surrounding *610 the execution of the documents, the amendments to the documents to accommodate Ronald Lauder's government service, the correlation of the information concerning a proposed public offering with the formula price arrived at by the affected parties (and the input of professional advisors in connection therewith), and perhaps other factual additions and amplifications that can be produced only by a full trial. We have determined that petitioner's health was satisfactory, so any further amplification in that regard certainly is not required and that issue, based upon our conclusion that decedent's health was satisfactory and normal for a man of his age, is irrevelant to the remaining issue before us. Accordingly, we will deny petitioners' motion for partial summary judgment and schedule this case for trial. An appropriate order will be entered. Footnotes
*. This case was originally assigned to Judge B. John Williams, who resigned from the Court effective March 1, 1990. The case was assigned to Judge Hamblen on November 20, 1989.↩
1. Unless otherwise indicated, all rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code of 1954, as amended and in effect as of the date of decedent's death.↩
2. On petitioner's Federal estate tax form the value of the stock was calculated to be $ 4,300 per share. On brief, petitioner argues that the value was overstated because it did not reflect the payment of recent dividends and that the correct value was $ 4,111 per share.↩
3. The grandchildren are the children of Leonard and Ronald Lauder.↩
4. Of this amount, respondent agrees that $ 16,169,260.47 can be deducted from the deficiency to reflect the payment of State death taxes.↩