**ST. LOUIS COUNTY BANK, Executor of the Estate of Lee J. Sloan, deceased, Appellee,**

v.

**UNITED STATES of America, Appellant.**

**No. 81–1675.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 14, 1982.

Decided April 5, 1982.

---

John F. Murray, Acting Asst. Atty. Gen., Michael L. Paup, Carleton D. Powell, Kristina E. Harrigan, Tax Division, Dept. of Justice, Washington, D. C., for United States; Robert D. Kingsland, U. S. Atty., St. Louis, Mo., of counsel.

Barry A. Short, Michael D. Mulligan, Steven A. Muchnick, Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., for appellee; Thomas E. Dittmeier, U. S. Atty., St. Louis, Mo., of counsel.

Before LAY, Chief Judge, ARNOLD, Circuit Judge, and WOODS,[*] District Judge.

ARNOLD, Circuit Judge.

The government appeals the District Court's entry of summary judgment in favor of St. Louis County Bank, executor[1] of the estate of Lee J. Sloan, in a suit brought to recover an alleged overpayment of estate taxes. See 28 U.S.C. § 1346(a)(1). The central question on the merits is the proper valuation of certain stock in L.J.S. Invest-

ment Company held by Mr. Sloan at the time of his death. Plaintiff filed in support of the motion affidavits of Nina Roth, Sloan's daughter, Dennis K. Woodside, attorney for L.J.S. and Sloan, and John L. Musser, accountant for L.J.S. The government opposed the motion but did not submit any affidavits in support of its position. Instead it asserted that material fact issues remained in dispute. The District Court granted the plaintiff's motion and filed a supporting memorandum, *Roth v. United States, supra.* The government now appeals. Because we believe that genuine issues of material fact remain to be resolved at trial, we reverse.

I.

As of December 24, 1956, Lee J. Sloan owned all but one of the 466 shares of Sloan's Moving & Storage Company. The one share not owned by him belonged to his wife. On that day he made five gifts of 38 shares each (190 shares in all) to the following persons: Nina Roth (his daughter); Karl Roth (his son-in-law); and in trust for the benefit of Nancy Lee, Judy Ann, and Joy Anita Roth (his granddaughters).

Sometime after the gifts were made Sloan became concerned about the possibility that the stock might pass to persons outside the family. Sloan asked Woodside to prepare an agreement restricting the transfer of the stock. In 1964 all the shareholders entered into such an agreement, restricting inter vivos transfers of the stock to persons outside of Lee Sloan's immediate family. Under the agreement, at the death of any shareholder or at any time a shareholder wished to transfer his or her stock to someone outside the family, the company and the other shareholders had the option to purchase the shares at a price determined by a formula set out in the agreement. If the company or other family

---

question whether the discharge provisions of the Code also work an implied repeal of section 207.

[*] The Hon. Henry Woods, United States District Judge for the Eastern District of Arkansas, sitting by designation.

1. Mrs. Nina Roth, Sloan's daughter and plaintiff in the proceedings below, was executrix of the estate until her death on May 30, 1981. See *Roth v. United States,* 511 F.Supp. 653 (E.D. Mo.1981). St. Louis County Bank has become successor executor.

members failed to exercise their option, the shares could then be sold to someone outside the family. The formula price provided for in the agreement was ten times the average annual net earnings per share for the five years preceding the offer, adjusted to eliminate gains or losses on real estate and the income-tax consequences of such gains or losses.

Until 1972 the company continued to engage in the moving, storage, and parcel-delivery business. In that year the company sold virtually all of its operating assets and changed its name to L.J.S. Investment Company. Thereafter it engaged primarily in the rental of real estate. This change in the nature of the business had a significant, adverse impact on the "value" of the stock of the company. While engaged in the moving business the company generated substantial yearly income as defined by the formula in the stock-purchase agreement. From the years 1964 to 1970 the value per share of the stock, as measured by the formula embodied in the agreement, fluctuated from a high of $1,061.15 in 1968 to a low of $597.00 in 1970. As a company engaged in the rental of real estate, however, the "value" of each share of L.J.S. Investment Company as determined by the formula went down to $0 per share in 1971, and remained at that level through 1975. This was so because L.J.S. began to show substantial net losses as defined in the stock-purchase agreement. The years after 1975 are not relevant to our discussion here.

During this time there was one death among the parties to the stock-purchase agreement, that of Karl Roth. Karl left his entire estate, including his stock, to his wife, Nina Roth, who also served as his executrix. She did not offer the shares to either the corporation or the surviving shareholders as called for in the agreement, and apparently there was no objection. At that time Karl Roth's shares could have been purchased pursuant to the agreement for $0 per share. For federal-estate-tax

purposes his estate reported the shares at $850 per share, reflecting their adjusted book value.

At the date of Lee J. Sloan's death, May 8, 1976, he held 265 shares of L.J.S. Investment Company, a controlling interest in the company. Shortly after Sloan's death his estate offered his 265 shares to the company under the terms of the stock-purchase agreement at $0 per share. The company accepted. As a result, Sloan's daughter and granddaughters became the beneficial owners of all the stock.

Sloan's estate filed an estate-tax return in February of 1977 and paid the sum of $36,383.06. On the return the 265 shares of stock were valued at $0 per share. On March 26, 1979, the Internal Revenue Service assessed a deficiency of $23,179.35 based on a valuation of L.J.S. stock at $544.60 per share, their book value. At the time the total assets of L.J.S. were valued at approximately $256,000, of which $201,000 was in cash. The estate paid the deficiency, and this action followed.

## II.

The government's principal argument for reversal is that the District Court erred in granting summary judgment because there were genuine issues of fact left unresolved.[2] When considering a motion for summary judgment a court must view the facts in the light most favorable to the party opposing the motion, and it must afford that party the benefit of all favorable inferences which may be derived from the facts contained in the pleadings, depositions, and affidavits. *McLain v. Meier*, 612 F.2d 349, 356 (8th Cir. 1979). The granting of the motion is appropriate only where there is no genuine issue of material fact and where the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *Vette Co. v. Aetna Casualty & Surety*, 612 F.2d 1076 (8th Cir. 1980). With

2. The government argues that it was entitled to a judgment in its favor because the stock-purchase agreement was either unenforceable or abandoned by the parties to the agreement.

The court below held to the contrary on both points as a matter of Missouri state law. We have found no error of law in these holdings.

these standards in mind we now look to the decision of the District Court.

■ The law of the tax consequences of restrictive agreements to purchase stock is, for the most part, well settled. Several courts of appeals have held that such agreements, if enforceable both at death and during a person's lifetime, establish the value of the stock for estate-tax purposes. See *Brodrick v. Gore*, 224 F.2d 892 (10th Cir. 1955); *May v. McGowan*, 194 F.2d 396 (2d Cir. 1952); *Wilson v. Bowers*, 57 F.2d 682 (2d Cir. 1932). Embodied in these decisions is the rule stated in Treas.Reg. § 20.2031–2(h) (1958), that

> [e]ven if the decedent is not free to dispose of the underlying securities at other than the option or contract price, such price will be disregarded in determining the value of the securities unless it is determined under the circumstances of the particular case that the agreement represents a bona fide business arrangement *and* not a device to pass the decedent's shares to the natural objects of his bounty for less than an adequate and full consideration in money or money's worth.

(Emphasis ours).[3] In sum, the law is that a restrictive agreement may fix the value of property for estate-tax purposes if the agreement has a bona fide business purpose and if it was not used as a tax-avoidance testamentary device.

■ We have no problem with the District Court's findings that the stock-purchase agreement provided for a reasonable price at the time of its adoption, and that the agreement had a bona fide business purpose—the maintenance of family ownership and control of the business. Courts have recognized the validity of such a purpose. See *Estate of Bischoff v. Commissioner*, 69 T.C. 32 (1977); *Estate of Reynolds v. Commissioner*, 55 T.C. 172 (1970); *Slocum v. United States*, 256 F.Supp. 753 (S.D.N.Y.1966). Here the District Court concluded that the existence of a valid business purpose necessarily excluded the possibility that the agreement was a tax-avoidance testamentary device. 511 F.Supp. at 654–55. We disagree. The fact of a valid business purpose could, in some circumstances, completely negate the alleged existence of a tax-avoidance testamentary device as a matter of law, but those circumstances are not necessarily presented here.

At the time of the agreement Lee J. Sloan had a heart condition and had previously suffered two heart attacks in the early 1960's. Designated Record p. 65. Given this fact and the fact of the family relationship between the parties to the agreement, a reasonable inference could be drawn that the agreement was testamentary in nature and a device for the avoidance of estate taxes. Similar facts were before the court in *Slocum v. United States, supra*. The court there recognized that varying inferences could be drawn from the facts surrounding the agreement, and thus left the drawing of those inferences to the trier of fact at trial. 256 F.Supp. at 755.

We are also bothered by the fact that decedent's stock was valued by his estate for estate-tax purposes at $0 when its total book value was admittedly in excess of $200,000. Appellee argues that courts should look only to the adequacy of the consideration at the time the agreement was entered into, rather than the date of decedent's death, when considering whether the agreement is a testamentary device to avoid estate taxes. *Estate of Bischoff v. Commissioner, supra*, 69 T.C. at 41 n.9. This may well be the best rule of general applicability (although appellees cite no appellate authority, and we have found none), but we think it has no application in the case at bar.

In 1964 the parties to the stock-purchase agreement adopted a formula for valuation of the stock that was admittedly reasonable at the time. However, some seven years later the assets of the moving and storage business, which was generating substantial net income as defined by the formula, were

---

**3.** In *May v. McGowan, supra*, 194 F.2d at 397, the court noted that the trial court had found no tax-avoidance motive. And in *Wilson v. Bowers, supra*, one of the parties to the restrictive agreement seems to have been a non-family member.

liquidated, and the proceeds transferred to an investment company, which engaged primarily in the rental of real estate. As a result of this transformation in the nature of the business, the value of the stock as determined by the formula was reduced to zero. Moreover, from all indications the decision to sell the assets of Sloan's Moving and Storage was Lee J. Sloan's and his alone. He held a majority of the stock, and there is no evidence that any of the minority shareholders took an active part in the management of the company. In light of these facts it would be unreasonable to restrict the court's inquiry to the adequacy of consideration and the conduct of the parties at the time of the agreement. The contrary rule, urged by taxpayers, may have some appeal in a situation where a wide disparity in formula price and other valuation methods, such as book value, is a result of failure of the business to generate a profit or other economic conditions outside the control of the parties to the agreement. Presumably such events would be within the contemplation of the parties to the agreement. The same cannot be said here where the nature of the business was completely transformed several years down the line.

Finally, the record reveals that at the time of Karl Roth's death the provisions of the agreement were not invoked. Under the agreement, at his death, his stock was to be offered first to the company at the formula price, and if refused, then to the other shareholders. Instead, his interest in the company passed under his will to his wife, Nina. At this point Karl Roth's shares (then numbering 43) could have been purchased at the formula price of $0 per share, though their book value was $850 per

share. These events could be the basis for an inference that the agreement was being used for the purpose of passing property to members of the family other than Lee J. Sloan, and thus ultimately accomplishing a tax-avoidance purpose benefiting the estate of Lee J. Sloan.[4]

At this stage of the case we must afford the government the benefit of all favorable inferences which could have been derived from the underlying facts. The historical facts themselves were left unchallenged by the government, to be sure, but they are subject to more than one interpretation. The trier of fact at trial should decide which interpretation is more persuasive. The judgment of the District Court is reversed, and the cause is remanded for further proceedings consistent with this opinion.[5]

It is so ordered.

---

4. The adverse inference here is not that the agreement was used to benefit Karl Roth's estate. Indeed, on his estate-tax return his holdings were valued at $850 per share, their book value. Had the formula been used, his interest in the company would have been valued at $0. Dennis K. Woodside, attorney for Roth's estate as well as Lee J. Sloan and the company, stated that "it did not occur to [him] that the Stock Purchase Agreement might be used in that fashion." Designated Record p. 38. Of course, the trier of fact might think that the parties'

conduct at the time of Roth's death shows there was no tax-avoidance purpose. Our point is that a contrary inference may reasonably be drawn.

5. After argument the parties filed a joint motion to remand to the District Court for modification of the judgment to reflect changes in the amount of deductible expenses of administration. Since the case is being remanded for trial, this motion may be addressed to the District Court.