ESTATE OF WALON L. CARPENTER, DECEASED, JOE K. CARPENTER, JR., EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Carpenter
Docket No. 13015-90
United States Tax Court
T.C. Memo 1992-653; 1992 Tax Ct. Memo LEXIS 695; 64 T.C.M. (CCH) 1274; November 9, 1992, Filed *695 Decision will be entered under Rule 155. For Petitioner: Bruce P. Ely, F. Mitch McNab, and David M. Wooldridge. For Respondent: Marshall R. Jones. SCOTT SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in the Federal estate tax of the Estate of Walon L. Carpenter, deceased,in the amount of $ 700,181.01. Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for decision only the fair market value of 50 shares of stock in Carpenter and Shirley Lumber Co. at the date of decedent's death. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Walon L. Carpenter (decedent) died on June 14, 1986. At the time of his death, decedent resided in Millport, Alabama. The executor of the estate, Joe K. Carpenter, Jr., resided in Ragland, Alabama, at the time of the filing of the petition in this case. The executor, Joe K. Carpenter, Jr., was decedent's nephew and was the principal beneficiary of decedent under the terms of his will. Carpenter and Shirley Lumber Co. (C&S) was incorporated on November 1, 1963, and had 100 issued and outstanding shares of stock. At *696 the time of his death, decedent owned 50 shares of C&S, and the remaining 50 shares were owned by James C. Shirley. Until the date of his death, decedent was president of C&S and Mr. Shirley was secretary/treasurer. Decedent and Mr. Shirley each had an equal share in the financial results of the business activities of C&S. On November 1, 1963, the shareholders of C&S executed a document entitled "Stockholders Agreement Restricting Transfer of Stock of Carpenter and Shirley Lumber Company, Incorporated" (1963 Stock Agreement). Paragraph 3 of the 1963 Stock Agreement states: In the event of the death of any person holding common stock of this corporation, any officer or subscribing common stock holder shall have the option, within sixty (60) days after such decease, or within sixty days after the appointment and qualification of an executor or administrator of such decedent, to purchase any or all of the common stock of such decedent, at a price to be determined by the same method hereinabove provided, and a tender of the amount of such decedent shall thereupon transfer the certificates evidencing ownership of such common stockholder purchasing the same. [sic] Paragraph 1 of *697 the 1963 Stock Agreement states that the purchase price is equal to "the amount of the book value of said common stock as shown upon the last annual statement of the corporation". The stock certificates issued when C&S was formed carried a notation that transfer of the shares was restricted. [1] On September 1, 1981, the shareholders of C&S executed a document entitled "Restricted Stock Agreement" (Agreement). Decedent also executed this document for C&S as its president. The Agreement states in part: that the success of Carpenter and Shirley Lumber Company requires [the shareholder's] active interest and support, and it is therefore reasonable to prevent the introduction into ownership of strangers not willing and able to contribute in like manner to the success of Carpenter and Shirley Lumber Company by restricting the privilege of owning stock in Carpenter and Shirley Lumber Company. Further relevant portions of the Agreement state as follows: (1) RESTRICTIONS ON STOCK: Once issued, no share of stock of Carpenter and Shirley Lumber Company shall hereafter be sold, mortgaged, pledged, exchanged, bartered, transferred, assigned,given away,bequeathed, or otherwise alienated *698 or disposed of, in any manner whatsoever, to any person or legal entity, except as may hereinafter expressly be provided, until the procedures and requirements outlined in the following paragraphs have been observed and complied with. (2) OFFER TO CORPORATION: Upon the occurrence of any of the events outlined above in Paragraph Numbered (1), the Stockholder whose stock is subject to the occurrence of one of the events enumerated (hereinafter sometimes referred to as "Selling Stockholder") must offer all or a portion of his or her stock to Carpenter and Shirley Lumber Company, at the purchase price hereinafter described. The offer shall include all of the stock of such Selling Stockholder that is subject to the event described above in Paragraph Numbered (1). * * * (4) REJECTION: If Carpenter and Shirley Lumber Company rejects the aforesaid offer, or does not formally accept the same within ten (10) days after written notice, the Selling Stockholder shall be free to sell, transfer,assign or encumber his or her stock to any other person, firm or legal entity without restriction, except as hereinafter may expressly be provided. * * * (6) PURCHASE PRICE: The purchase price at which *699 said stock must be offered to Carpenter and Shirley Lumber Company, shall be an amount equivalent to the book value of said stock determined as of the end of the fiscal year next preceding the date on which the said offer is accepted, such value to be determined by the accountant in charge of the books of Carpenter and Shirley Lumber Company. The accountant's determination as to the said purchase price shall be made according to accepted accounting principles and shall be binding on the parties hereto. However, the parties hereto may from time to time agree in writing upon a different value to be employed as the purchase price hereunder, and in such event such agreed upon price shall be employed as the purchase price hereunder, if such value is attached in writing to this Agreement and initialed by the parties hereto. * * * (8) LIQUIDATION AND DISSOLUTION OPTION: Upon the occurrence of any of the following events, Carpenter and Shirley Lumber Company may be liquidated and dissolved in accordance with the Alabama Business Corporation Act at the option of the other or remaining Stockholder of Carpenter and Shirley Lumber Company: (i) Death of a Stockholder. (ii) Total and *700 permanent disability of a Stockholder for a period of One Hundred Eighty (180) days from the onset of such disability. (iii) At the election of any Stockholder by a notice in writing in accordance with this Agreement to the remaining or other Stockholder. Upon the occurrence of any of the aforesaid events, Carpenter and Shirley Lumber Company shall be liquidated and dissolved as aforesaid as soon as practicable thereafter in accordance with standard commercial practices applicable to the business of Carpenter and Shirley Lumber Company. After the payment of the known debts and obligations of Carpenter and Shirley Lumber Company, or making suitable provision for the payment thereof, the remainder of Carpenter and Shirley Lumber Company's assets shall be distributed to the Stockholders in cash or in kind, according to their respective rights and interests. The Agreement states that it supersedes the 1963 Stock Agreement and that it will be construed and interpreted in accordance with the laws of the State of Alabama. *701 Mr. Shirley intended that at his death the Agreement would be binding on his estate and that if he left C&S, the Agreement would determine what would happen to his stock. Mr. Shirley believed that the Agreement was also intended to provide the continuing shareholder with the option of continuing the business or liquidating C&S. Mr. Shirley, from his discussion with decedent, believed that decedent shared his understanding of the Agreement. Decedent and Mr. Shirley discussed the use of book value as the price of the stock and were advised by their attorney and accountant as to the merits of alternative pricing mechanisms, including formulas and appraisals. Mr. Shirley was concerned with agreeing on a price that would be affordable for the continuing shareholder and a price which would not bankrupt C&S or the continuing shareholder. Based on conversations with decedent, Mr. Shirley believed he shared these concerns. Mr. Shirley wanted a price that would provide certainty, would avoid the need for outside appraisals, and could not be manipulated. The present book value of C&S was calculated. At the time the Agreement was signed Mr. Shirley and decedent discussed whether book *702 value was a fair representation of the value of the business and Mr. Shirley understood that at the time the Agreement was signed they agreed it was. Article XX of the Last Will and Testament of decedent stated that at the time of his death there might exist certain agreements providing for the disposition of his interest in the said business and that "I specifically authorize and direct my Executor to carry out the terms of any such agreements". On September 1, 1981, decedent and Mr. Shirley executed a document entitled "Agreement of Division". On February 26, 1985, decedent and Mr. Shirley executed a document entitled "Amended and Restated Agreement of Division of Real Property". These documents covered the real estate owned jointly by decedent and Mr. Shirley and provided for the division of these properties upon the liquidation of C&S. C&S also owned real estate. On December 26, 1986, a special joint meeting of the shareholders and board of directors of C&S was held. At the meeting, Joe K. Carpenter, Jr., was elected a director of C&S. The bylaws were amended so that the board of directors could consist of only one member and not more than seven. The president of C&S *703 was authorized and directed to execute the Agreement on behalf of the corporation and have C&S purchase the stock held by decedent's estate. Joe K. Carpenter, Jr., resigned as director of C&S, effective upon the closing of the sale of the stock held by the estate to C&S. Pursuant to a calculation by C&S's accountant of the book value purchase price payable under the Agreement, the stock was sold to C&S for $ 107,073. The balance sheet as of October 31, 1985, showed $ 215,505.61 as the net worth of C&S. Joe K. Carpenter, Jr., was advised by his attorney that he was obligated to sell the stock held by decedent to C&S at its book value. Based on this advice and his own reading of decedent's will, Joe K. Carpenter, Jr., believed he was required to sell decedent's stock in C&S to the corporation at its book value. The attorney who represented decedent's estate and Joe K. Carpenter, Jr., was a member of the same firm as the attorney for C&S and the attorney who had drafted the 1981 Agreement. This attorney at the time of drafting the 1981 Agreement also represented both Mr. Shirley and decedent personally. This attorney had advised both Mr. Shirley and decedent of a possible conflict *704 of interest and suggested that each of them consult another attorney, but neither had done so. On December 26, 1986, Joe K. Carpenter, Jr., in his individual capacity and as executor of the estate of Walon L. Carpenter, deceased, and Mr. Shirley, in his individual capacity and as president of C&S, executed a document entitled "Settlement Agreement". Among other things, this document provided for the sale of the stock held by the estate to C&S at the buy-sell price. The same parties also executed an undated document entitled "Amendment to Settlement Agreement" which purported to make the stock sale effective October 31, 1986. C&S was liquidated and dissolved at the end of 1986, with Mr. Shirley receiving all of its assets. A certificate of dissolution was issued on December 31, 1986. On his 1986 Federal income tax return, Mr. Shirley reported the value of the property he received in the liquidation as $ 1,733,326.49, subject to liabilities of $ 656,096.20, leaving a net value of $ 1,077,230.29. After the liquidation of C&S, Mr. Shirley joined with two brothers in another business entity to operate the lumber mill previously operated by C&S. He kept the real property which he *705 received in the liquidation of C&S as long as the mill was operating, which was a little over a year after decedent's death. After the mill ceased to operate Mr. Shirley sold one of the tracts of land he received in the liquidation of C&S for about $ 950,000. He sold the mill for a $ 500,000 note, but at the date of trial of this case had received only a small payment on the note. C&S had sustained losses for several years prior to decedent's death. At the time of his death decedent was 61 years old and Mr. Shirley was 72 years old. Decedent was killed in an automobile accident. Mr. Shirley's and decedent's only relationship was that of business associates. The Federal estate tax return for decedent's estate was timely filed on March 19, 1987. The return listed the 50 shares of C&S stock owned by decedent at a value of $ 107,073. In the notice of deficiency, respondent determined that the value of the 50 shares of C&S stock held by decedent at the date of his death was $ 1,342,307.74. Respondent concedes that the value of the 50 shares of C&S stock as determined in the notice of deficiency should be adjusted downward by 50 percent of $ 656,096.20, which was the amount of *706 liabilities assumed by Mr. Shirley in the liquidation. OPINION Under section 2033[2] the gross estate of a decedent includes the value of all of the decedent's property to the extent of his interest therein at the time of his death. Under the provisions of section 20.2031-1(b), Estate Tax Regs., the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts, is the value at which property is included in the estate. Generally this amount is the fair market value of the property. For securities listed on an exchange, generally it is easy to determine the fair market value by reference to the published price on the day the determination is made. In the case of closely *707 held corporations, absent arm's-length sales around the valuation date, the value of the stock may be determined by valuation of the underlying assets, consideration of sales of stock of comparable companies, or other relevant evidence. However, an agreement permitting the purchase of a security at a stated price which is binding on the holder of the security and his estate may fix the value of the security. Helvering v. Salvage, 297 U.S. 106 (1936). This Court has considered on numerous occasions whether an agreement by a decedent to sell stock at a fixed price was determinative of the value of that stock for estate tax purposes. Clearly in order for such an agreement, generally referred to as a buy-sell agreement, to fix the value of the stock for estate tax purposes, the estate must be contractually bound to sell the stock at the agreed price and must not be able to receive any price greater than that set forth in the agreement. United States v. Land, 303 F.2d 170 (5th Cir. 1962). We have held that if the shareholder was not bound during his lifetime to sell the stock at the agreed price, or was allowed to sell *708 it at a greater price without first offering the stock to either the corporation or other shareholders at the price set forth in the agreement, then the agreement price provided for the estate does not fix the value of the stock. Estate of Weil v. Commissioner, 22 T.C. 1267-1273 (1954). If the decedent could have sold the securities at a higher price during his lifetime, the agreement for the estate to sell at the lower price is testamentary in nature. Cases have also considered whether the arrangement was bona fide and not merely a substitute for a testamentary devise and whether the price fixed was reasonable at the time the agreement was entered into. Estate of Bischoff v. Commissioner, 69 T.C. 32, 41 n.9 (1977). Section 20.2031-2(h), Estate Tax Regs., provides with respect to securities subject to an option contract to purchase that the effect if any to be given to such option or contract price in determining the value of the securities for estate tax purposes depends upon the circumstances of the particular case. The regulation states that little weight will be accorded a price contained in an option or contract *709 under which the decedent is free to dispose of the underlying securities at any price he chooses during his lifetime. The regulation goes on to state that even if decedent is not free to dispose of the underlying securities at other than the contract price during his lifetime, such price will be disregarded in determining the value of securities unless it is determined under the circumstances of the case that the agreement represents a bona fide or business arrangement and not a device to pass decedent's shares to the natural object of his bounty for less than adequate and full consideration in money and money's worth. The agreement in the instant case did require that the stock of Carpenter and Shirley be offered for sale to the corporation at its book value if either stockholder was disposing of the stock during his lifetime. Mr. Shirley and decedent were not related but were merely business partners. Respondent, however, contends that because of the provisions of paragraph 8 of the Agreement with respect to dissolution of the corporation, decedent could have effectively required dissolution of the corporation and, therefore, effectively disposed of his shares other than at *710 the price fixed in the buy-sell agreement during his lifetime. Respondent further contends that the book value price was not a reasonable price at the time the Agreement was entered into in 1981. Although petitioner attacks the valuation placed by respondent on decedent's shares of stock, it is clear from the record that the actual fair market value of the stock at the date of decedent's death, absent any restrictions or absent consideration of the buy-sell agreement, was in excess of the price under the buy-sell agreement. Shortly after the sale of the stock under the Agreement to C&S, Mr. Shirley dissolved the corporation and reported on his 1986 return the value of the assets he received upon dissolution as $ 1,733,000, with liabilities of $ 656,000, or a net value of the corporation upon dissolution of $ 1,077,000. While petitioner attacks respondent's use of this valuation and further attacks respondent's increase in the amount by an amount subsequently received on the sale of certain of the land distributed to Mr. Shirley upon dissolution of the corporation, the valuation placed by Mr. Shirley on the corporation upon its dissolution is certainly sufficient evidence to show *711 that the decedent's stock if unrestricted as to sale would have been worth substantially more at the date of his death than was received under the buy-sell agreement. Petitioner argues however that even if the buy-sell agreement did not fix the value of the stock in an absolute sense, the existence of this buy-sell agreement effectively set the value of the stock, relying on our holding in Estate of Hall v. Commissioner, 92 T.C. 312 (1989). Petitioner points out that the buy-sell agreement here is enforceable under the law of Alabama. Hodges v. Pittman, 384 So. 2d 14 (Ala. 1980). Actually respondent does not argue specifically that the Agreement is not enforceable but rather argues that it does not meet the criteria necessary to form the basis of the valuation of the stock for estate tax purposes, but is rather testamentary in nature. Certainly if the Agreement were clearly not enforceable under Alabama law, it would not be controlling on the value of the stock although its existence might have some effect on such value, but the fact that it is enforceable under Alabama law does not answer the question whether it is *712 controlling since the nature of the transfer may have been testamentary. Respondent's primary argument is that under the provision of paragraph 8 of the Agreement decedent would have been in a position to unilaterally have the company liquidated during his lifetime, and therefore the Agreement to sell at book value was only effective at decedent's death and was therefore testamentary in nature. Respondent also argues that the book value price agreed upon by the parties was not an arm's-length negotiated realistic price at the time the 1981 Agreement was entered into, that there was no business purpose for the Agreement, and that the existence of the buy-sell agreement should be viewed merely as a bequest of the value of the stock in excess of the agreed price to Mr. Shirley. It appears to us that under paragraph 8 of the Agreement it is reasonably clear that the other stockholder has the choice of whether to go along with the liquidation if a liquidation is proposed by one stockholder. The provision states that upon the occurrence of any of the following events C&S may be liquidated and dissolved at the option of the other or remaining stockholder of C&S. The three situations *713 listed are: (1) Death of a stockholder, (2) total and permanent disability of a stockholder for a period of 180 days from the onset of such disability, and (3) at the election of any stockholder by a notice in writing in accordance with the Agreement to the remaining or other stockholder. It seems that the reasonable interpretation is that if a stockholder dies, the remaining stockholder may elect to dissolve the corporation and then split the assets between himself and the estate of the deceased stockholder, that the remaining stockholder has the same right if a stockholder remains disabled for a period of over 180 days, and finally the remaining stockholder has the right or option to select dissolution of the corporation if the other stockholder proposes such dissolution. It is clear that Mr. Shirley could have opted when Mr. Carpenter died to exercise the rights under paragraph 8 and have dissolved the corporation and split the assets. However, it is clear that it was Mr. Shirley's option to have the corporation dissolved and not a requirement. Respondent suggests that the executor of decedent's estate would under paragraph 8 be viewed as a stockholder who might elect by notice *714 in writing to the other stockholder to have the corporation dissolved. However, the wording of paragraph 8 is that C&S may be dissolved "at the option of the other or remaining stockholder" in event of such election. Therefore it is reasonably clear that had the executor notified Mr. Shirley in writing that he would like the corporation dissolved, Mr. Shirley would at his option have been permitted to consent to the dissolution or to enforce the right of C&S to buy the stock under the provisions of paragraph 1 of the Agreement. Paragraph 1 states that no share of C&S stock shall be bequeathed or otherwise alienated or disposed of in any manner to any person or legal entity except as provided therein. The provision is for offering the stock to the corporation at its book value. It therefore appears to us that under this Agreement decedent during his lifetime did not have the right to demand dissolution of the corporation without Mr. Shirley's consent, nor did the executor have such right after decedent's death. This was certainly the interpretation that Mr. Shirley said he understood to be the intent that he and decedent had when the Agreement was entered into. The drafter of *715 the Agreement also testified that this was the intent he had in drafting the agreement and that he had expressed this understanding to the parties. In any event the executor said he did not question Mr. Shirley's right to have C&S buy the stock and believed he was obligated to sell the stock to C&S. Also the record shows that Mr. Shirley was 11 years older than decedent. There is no indication in the record that decedent was not in good health at the time of his death in an automobile accident and as petitioner argues, the inference is that the parties probably had in mind when the Agreement was made that Mr. Shirley might want to retire from operating the lumber mill or pull out of it or that he might die while decedent was still young enough to want to continue the operations. Certainly the only testimony in the record is that the business purpose of the Agreement was to enable the lumber mill to be kept in operation by the remaining stockholder. Mr. Shirley testified that he considered book value as a realistic value in 1981, recognizing that it would be an amount easy to compute and not cause a problem as to value as an appraised value would. He testified that book value *716 was an amount that the company could pay and continue to operate. Mr. Shirley's testimony was that he considered book value a fair price when it was agreed to in 1981 and that from his conversations with decedent he concluded decedent also considered book value a fair price. There is nothing else in the record to show what the actual fair market value of this stock might have been in 1981. The Agreement provided for a yearly review of the price but the parties never changed the price. From the testimony in this record, we conclude that the weight of the evidence is that the book value price the parties agreed to in 1981 was agreed to in an arm's-length negotiation between the two of them and for business reasons and in that sense was a realistic price. On weighing all of the evidence in this case, we conclude that the situation here falls within the group of cases such as Estate of Littick v. Commissioner, 31 T.C. 181 (1958). On the evidence as a whole we conclude that there did exist a business purpose for the Agreement and that the price was at least an arm's-length negotiated price and in that sense reasonable at the time it was entered into. *717 As we pointed out in Estate of Bischoff v. Commissioner, 69 T.C. 32, 39 (1977), it has long been recognized that a buy-sell agreement in effect at the date of a decedent's death may fix the value of the stock of a closely held corporation if: (1) It is an enforceable agreement, (2) it applied to the stock during the lifetime of the decedent as well as at his death, and (3) it had a bona fide business purpose rather than being testamentary in nature. The fact that there is a family relationship between the individuals to an agreement has not caused such agreements always to be ignored, but the lack of such relationship has been considered evidence of a lack of testamentary intent by the agreement. Here, there was no family relationship between decedent and Mr. Shirley. They were business partners and there was a business purpose to the Agreement which was to allow the surviving stockholder to keep the lumber mill operating. Here the facts are very much like those in Estate of Bischoff v. Commissioner, supra, where we held that the agreement fixed the price at the date of the death of one of the partners who had *718 entered into a buy-sell agreement with the other partners. On the basis of this record, we conclude that the buy-sell agreement fixed the value of the stock. See Estate of Hall v. Commissioner, 92 T.C. 312 (1989). We therefore conclude that the value of decedent's C&S stock at the date of his death was the $ 107,073 received for it from C&S in accordance with the buy-sell agreement. Decision will be entered under Rule 155. Footnotes
1. Initially 49 shares were issued to Walon L. Carpenter, one to Amos L. Carpenter, and 50 to James C. Shirley. All three certificates carried the notation of the restriction on transfer. On November 1, 1978, the 1 share of Amos L. Carpenter was transferred to Walon L. Carpenter.↩
2. All section references are to the Internal Revenue Code in effect at the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩