ESTATE OF Frederick Carl GLOECKNER, Deceased, Joseph A. Simone, Executor and Douglas Dillon, Executor, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

Docket No. 97–4007.

United States Court of Appeals, Second Circuit.

Argued Dec. 15, 1997.

Decided Aug. 18, 1998.

James E. Daniels, New York, New York (Landis Olesker, Steven D. Goldberg, Hara K. Jacobs, Hall Dickler Kent Friedman & Wood LLP, New York, New York, of counsel), for Petitioners–Appellants.

Curtis C. Pett, Washington, D.C. (Teresa E. McLaughlin, Tax Division, Loretta C. Argrett, Assistant Attorney General, Department of Justice, Washington, D.C., of counsel), for Respondent–Appellee.

Before: OAKES, CARDAMONE, and CALABRESI, Circuit Judges.

CARDAMONE, Circuit Judge:

This appeal is brought by petitioners, who are the executors of the estate of Frederick Carl Gloeckner. The Commissioner of Internal Revenue, in reviewing the estate tax return for decedent Gloeckner, assigned a greater value than that which was claimed for shares of stock Gloeckner owned in a closely-held corporation he had founded. Petitioners reported the value of these shares to be the value set forth in a redemption agreement between decedent and his company. The Commissioner disagreed and in-

stead assessed a tax deficiency of $2,951,-936.96.

Upon receiving the notice of deficiency dated April 19, 1994, petitioners appealed to the United States Tax Court (Halpern, J.), arguing that the redemption agreement complied with the terms of a Treasury regulation allowing these kinds of agreements to determine the value of securities for estate tax purposes once certain prerequisites are met. In an order entered on October 16, 1996 the tax court agreed with the Commissioner that the agreement did not apply to fix the value of the stock, but thought that value was less than the amount the Commissioner had asserted. The tax court assessed a tax deficiency in the reduced amount of $561,077.79.

The key issue in this case is the interpretation of the relevant Treasury regulation. Our analysis requires us to resolve whether the beneficiary of the redemption agreement was the natural object of decedent's bounty, a somewhat elusive concept not admitting of one clear definition that would apply to all cases, but rather one best decided on a case-by-case basis. After examining the regulation's language and case law construing it, we think the tax court misapplied the regulation and that the value of the stock fixed in Gloeckner's redemption agreement should control. We therefore reverse and remand this matter for entry of judgment for the estate.

## BACKGROUND

### A. *Facts*

Gloeckner died on July 28, 1990 at the age of 88. Having never married, he left surviving as kin, a niece, nephew, grandniece and grandnephew. In 1934 he had founded Fred C. Gloeckner & Co., a New York corporation that distributed plants, bulbs and other horticultural products to commercial growers at wholesale prices. Decedent remained a shareholder and president of his company until his death.

Gustav Poesch became a shareholder in decedent's company in 1949 and ultimately served on its Board of Directors as its vice president. Gloeckner and Poesch signed a redemption agreement in 1960 restricting their rights to dispose of their stock in the company. By mid–1987 Gloeckner then aged 85 and Poesch aged 77 began to make new plans for the future of the company and the disposition of their stock. Gloeckner owned the majority of stock, Poesch held a minority interest, and the remainder belonged to the Fred C. Gloeckner Foundation.

Gloeckner wanted Joseph Simone, an unrelated company officer in his mid–30s, to own and manage the company after his death. Simone had begun working for the company in 1975, was elected its secretary in 1981, and was named to its Board of Directors as secretary/assistant treasurer several years later. Decedent had befriended the younger man to such extent that he gave Simone an interest-free loan of $80,000 in 1981, and another loan of $95,000 five years later, this time repayable with interest. These loans were secured by a mortgage on Simone's house. Other employees apparently received similar loans from decedent. Simone testified that he and Gloeckner shared a professional, but not social, relationship.

The critical year for purposes of this appeal is 1987. In accordance with Gloeckner's and Poesch's proposed plans, they along with Simone met with Gloeckner's attorney on June 11 of that year. During the meeting they discussed Poesch's intended charitable contribution of his preferred stock, redemption of his common stock by the company upon his death to allow his estate to pay the taxes attributable to that stock, and his bequest of any remaining common stock to Simone. Decedent also agreed to make an *inter vivos* gift of 20 shares of his common stock to Simone.

Meanwhile, Gloeckner's attorney was preparing a new will and corporate redemption agreement for decedent to sign. The redemption agreement provided that the corporation would buy as much stock upon Gloeckner's death as necessary to pay his estate taxes. This plan permitted Gloeckner's kin to receive a substantial majority of his estate by operation of his will—*excluding* his stock, and thereby any control, in the company—free from erosion for taxes or expenses.

Gloeckner signed the redemption agreement on July 10, 1987. Beyond requiring the company to purchase enough stock to cover the estate tax liability (beginning with the common stock and then purchasing preferred stock, if necessary), the agreement also restricted decedent's ability to sell or transfer his shares during his lifetime, granted the company first option to purchase his shares if he chose to sell them during his lifetime, and gave the company the option to purchase any remaining shares not redeemed to pay Gloeckner's estate taxes at the time of his death. The purchase price for each share was left blank in the redemption agreement, to be filled in after an appraisal could be made. Gloeckner's will bequeathed to Simone any common stock not repurchased by the corporation either for tax purposes or at its option.

Decedent also made the planned gift of 20 shares to Simone on July 10, 1987. That same day, Simone signed a restrictive agreement containing the same terms as those found within Gloeckner's agreement. Again, the purchase price was left blank until the appraisal was complete.

The company retained KPMG Benchmark to determine the fair market value of Gloeckner's shares of stock as of June 30, 1987. KPMG Benchmark reported on October 30, 1987 that the common stock was worth $440 per share, and the two classes of preferred stock were worth $34.75 and $48 respectively. These calculations were based upon numerous factors, including past transactions, marketability of the shares, investment quality of the shares, balance sheet figures (assets, liabilities and book value of the company), historical operating results, dividends paid historically, and dividend-paying capacity. Appraisers not only interviewed and corresponded with company management and other advisors to learn more about the company, but also reviewed the bases of investors' appraisals of publicly-traded shares of comparable companies at the valuation date. These figures were entered into Gloeckner's redemption agreement accordingly. The price of $290 per share entered into Simone's redemption agreement likewise originated from the KPMG Benchmark report.

Decedent signed his will on July 22, 1987, in which he bequeathed $40,000 to his "friend" Simone, along with any remaining common stock owned by him after the redemption agreement took effect. His kin were to receive the remainder of his estate less charitable contributions, including one giving all remaining preferred stock to the Fred C. Gloeckner Foundation.

Poesch, instead, contrary to the June 11 discussions, never entered into a new redemption agreement. The record does not indicate why. However, he did sell his shares of common stock back to the company on January 4, 1988 at the price listed in the agreement of $290 per share. That price, the same as that assigned to Simone's minority shares, came out of the KPMG Benchmark report. After this sale, Poesch remained a member of the Board of Directors. He died before these proceedings began in tax court.

When Gloeckner died, three years after signing the redemption agreement, the company had to buy all his shares to cover the estate taxes owed. Despite decedent's intent to spare his kin the burden of paying any estate tax out of their inheritance, the proceeds from the stock redemption were insufficient to cover the amount due, so that they were required to pay tax and administrative expenses of about $1 million.

## B. *Tax Court Proceedings*

When they filed the estate tax return, petitioners listed the value of Gloeckner's stock at $2,298,161.25—which was equal to the redemption price and the amount paid by the company. In assessing a tax deficiency, the Commissioner placed a value of $6 million on the shares. That action prompted the estate to commence the instant litigation in May 1994.

Trial was set for February 21, 1995. Under tax court Rule 143(f), each party was to submit expert reports 30 days in advance of trial, *i.e.*, January 20, 1995. The Commissioner filed and served a report on January 20. Petitioners told the court on January 27 and in writing on January 31 that they would use the 1987 KPMG Benchmark appraisal

report, a second report prepared in July 1991 for purposes of valuing the stock as of the alternative valuation date, and a third report prepared in January 1995 that elaborated upon the 1991 report. The Commissioner previously had received copies of the 1987 and 1991 reports during discovery.

The Commissioner filed a motion *in limine*, asking that petitioners' reports be excluded because they were not timely filed. The tax court granted the motion. Trial was held February 28 and March 1, 1995. Petitioners called Simone and Gloeckner's attorney as witnesses, and also introduced the 1987 report, not as an expert report, but rather as evidence that an appraisal was obtained. The Commissioner called an expert witness to give his opinion regarding the value of decedent's stock.

In ruling against petitioners, the tax court found that Gloeckner's redemption agreement served a testamentary purpose, and that the estate had failed to show the agreement reflected full and adequate consideration as of the date it was executed. Because of this failure, the tax court held, the agreement did not meet the requirements of the applicable Treasury regulation, and the responsibility for assigning a value to the stock thereby fell to the tax court. The court subsequently criticized certain aspects of the Commissioner's expert report and ultimately valued decedent's stock at $4 million. It then assessed a tax deficiency against petitioners for the difference between this $4 million amount and the stock's value as set forth in the redemption agreement. Petitioners filed a motion for reconsideration of their evidence or a new trial in which their export reports could be considered. Both requests were denied. This appeal followed.

## DISCUSSION

The estate asks on appeal that we reconsider both the application of the relevant Treasury regulation and whether petitioners met their burden of proof regarding full and adequate consideration. In the alternative, petitioners urge us to find that the tax court committed a clear error in reaching a valuation of $4 million, and that it abused its discretion in refusing to grant a new trial.

## I Standard of Review

■ We will not disturb the tax court's findings of fact unless they are clearly erroneous, *see Estate of Herrmann v. Commissioner*, 85 F.3d 1032, 1035 (2d Cir.1996), but will review its legal conclusions *de novo, see Bliss v. Commissioner*, 59 F.3d 374, 378 (2d Cir.1995).

## II Determining the Value of Decedent's Shares

### A. *Statutory and Regulatory Authority*

When a person dies a graduated tax is imposed on his estate, which is measured by the value of the property in the estate. *See* I.R.C. § 2001. The Tax Code provides that "[t]he value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated." *Id.* § 2031(a). "Value" means fair market value, which is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Treas. Reg. § 20.2031–1(b).

■ Determining the fair market value of stock of a closely-held corporation can be more complicated than discerning the value of publicly-traded stock, and usually requires consideration of, among other factors, the value of stock of companies listed on an exchange that are engaged in the same line of business. *See* I.R.C. § 2031(b). We have long recognized that for estate tax purposes, parties may also fix the value of closely-held stock in a restrictive buy-sell or redemption agreement. *See May v. McGowan*, 194 F.2d 396, 397 (2d Cir.1952); *Lomb v. Sugden*, 82 F.2d 166, 168 (2d Cir.1936); *Wilson v. Bowers*, 57 F.2d 682, 683–84 (2d Cir.1932).

The IRS has refined the use of these restrictive agreements through its regulations. Not all restrictive agreements are controlling with respect to estate tax valuation. "The effect, if any, that is given to the option or contract price in determining the value of the

securities for estate tax purposes depends upon the circumstances of the particular case." Treas. Reg. § 20.2031–2(h). While the regulation calls for a case-by-case evaluation of the totality of the circumstances, essentially four requirements have evolved for a redemption price to be considered binding for estate tax purposes.

■ First, the price of the stock must be fixed or determinable by a formula within the agreement. *See Estate of Lauder v. Commissioner,* 64 T.C.M. (CCH) 1643, 1656 (1992). Second, the estate must be obligated to sell the stock at this fixed price upon the shareholder's death. *See United States v. Land,* 303 F.2d 170, 175 (5th Cir.1962) (holding that because purchase restrictions expired upon the shareholder's death, forcing remaining partners to purchase those shares at full value, then full fair market value at the time of death was controlling for estate tax purposes). Third, in the event the decedent shareholder chose to sell his shares during his lifetime, he must have been obligated to sell them at the price fixed by the agreement, and not at any price he otherwise might have chosen. *See* Treas. Reg. § 20.2031–2(h); *Estate of Carpenter v. Commissioner,* 64 T.C.M. (CCH) 1274, 1278 (1992); *Estate of Weil v. Commissioner,* 22 T.C. 1267, 1273–74, 1954 WL 31 (1954). Fourth, the agreement must "represent[ ] a bona fide business arrangement and not a device to pass the decedent's shares to the natural objects of his bounty for less than an adequate and full consideration in money or money's worth." Treas. Reg. § 20.2031–2(h).

The Commissioner does not dispute that the restrictive agreement affecting Gloeckner's shares meets the first three requirements. That is, it concedes the stock price at issue was fixed within the redemption agreement and binding upon both the estate at decedent's death and Gloeckner during his lifetime. Thus, the crux of the Commissioner's argument is that Gloeckner drafted the agreement as a testamentary device to transfer the stock to the natural objects of his bounty without full consideration, and therefore Treas. Reg. § 20.2031–2(h) mandates that the price fixed within the agreement be disregarded in computing what estate taxes are owed.

### B. *Treasury Regulation § 20.2031–2(h)*

#### 1. Disjunctive or Conjunctive Test?

Nothing in the authorizing statute or commentary surrounding Treas. Reg. § 20.2031–2(h) explains whether the existence of a business purpose necessarily excludes the possibility that the agreement is also a testamentary device, and vice versa. Some courts have expressed the view that the test is conjunctive, suggesting that an agreement that determines value for estate taxes must be found to be both a *bona fide* business arrangement *and* not a testamentary substitute. *See, e.g., Dorn v. United States,* 828 F.2d 177, 182 (3d Cir.1987); *St. Louis County Bank v. United States,* 674 F.2d 1207, 1210 (8th Cir.1982). Not all courts agree. *See, e.g., Estate of Seltzer v. Commissioner,* 50 T.C.M. (CCH) 1250, 1254 (1985) ("If the contract fixing the price is a substitute for testamentary grant or devise, the contract is held to lack a bona fide business purpose.").

Any uncertainty about how to interpret the rule regarding agreements entered into or substantially modified after October 8, 1990 was put to rest when Congress passed the Omnibus Budget Reconciliation Act of 1990 (1990 Act). The Senate specified that an agreement could fix the value of stock for estate tax purposes only if it met two criteria, *i.e.,* it was *both* a *bona fide* business arrangement and not a testamentary device (a third criterion also inserted is not applicable on this appeal because it was enacted subsequent to the date of the subject agreement). *See* Omnibus Budget Reconciliation Act of 1990, Pub.L. No. 101–508, § 2703, 104 Stat. 1388, 1388–498 (codified at I.R.C. § 2703); H.R. Conf. Rep. No. 101–964, at 1133, *reprinted in* 1990 U.S.C.C.A.N. 2374, 2838. The Internal Revenue Service (IRS) reinforced this understanding when it promulgated new regulations following passage of the 1990 Act. *See* Special Valuation Rules, 56 Fed.Reg. 14,321, 14,325 (1991) ("Consistent with the legislative history, the proposed regulations clarify that these . . . tests are independently applied.").

Although the Gloeckner agreement is subject only to Treas. Reg. § 20.2031–2(h), the wording of which remained unchanged after the 1990 Act, the history surrounding the statute is nevertheless helpful. Since the 1990 Act for all intents and purposes codifies this pre-existing regulatory language, it is instructive as to how such language should be applied to agreements entered into even before 1990. Moreover, we would not be subjecting the 1987 Gloeckner agreement to a different set of standards than could otherwise be used, considering the reasoning employed in decisions such as *St. Louis County Bank* and *Dorn.* Consequently, the price of the shares contained in Gloeckner's redemption agreement will be the value used to calculate decedent's estate taxes only if that agreement is both a *bona fide* business arrangement and not a testamentary device.

### 2. *Bona Fide* Business Arrangement

■ The tax court found that one of Gloeckner's purposes in entering the redemption agreement was to plan for his company's future after he died. He intended for Simone to own and manage the company, so as to prevent outsiders and family members from becoming involved. This factual conclusion is not clear error in light of the evidence in the record, and the Commissioner has given us no reason to think otherwise.

■ Applying relevant legal principles to these facts, we agree with the tax court that the Gloeckner agreement represents a *bona fide* business arrangement. This test is sufficiently satisfied when the purpose of a restrictive agreement is to maintain current managerial control—whether by family or outsiders. *See, e.g., St. Louis County Bank,* 674 F.2d at 1210 (family); *Estate of Carpenter,* 64 T.C.M. (CCH) at 1280 (unrelated business partner).

### 3. Testamentary Device

■ Decedent's estate admits that, in addition to serving a legitimate business purpose, the agreement was a means to transfer Gloeckner's assets to his kin without having them shoulder the burden of his estate taxes. As noted earlier, under the terms of the agreement, the company was required to purchase as many shares as necessary to satisfy whatever estate tax was owed. The tax court ruled that Gloeckner was attempting to reduce the tax on his estate, and therefore entered the agreement in 1987 for a "testamentary purpose."

The terms "testamentary substitute" and "testamentary device" are often used interchangeably with the phrase "device to pass the decedent's shares to the natural objects of his bounty." When analyzing the nature of a restrictive agreement, courts must tread with care in deciding what the terms employed actually mean. The plain language of Treas. Reg. § 20.2031–2(h), combined with courts' application of that regulation, suggests the tax court used too broad a concept in making that determination.

According to the regulation, an agreement is said to be testamentary when it seeks to convey shares of stock to the natural objects of decedent's bounty for less than full and adequate consideration. Therefore, the first question to ask is whether a natural object of decedent's bounty benefits from the conveyance in the restrictive agreement. If the answer to that question is "no," then the inquiry ends, and a court must conclude that the agreement at issue is not a testamentary device. Concluding instead that the agreement may serve some kind of very general testamentary purpose without focusing on to whom the shares of stock are conveyed, and then jumping ahead to ask whether full and adequate consideration was received—as the tax court did here—misses the relevance of the phrase "natural object of decedent's bounty." *See Silverman v. Eastrich Multiple Investor Fund, L.P.,* 51 F.3d 28, 31 (3d Cir.1995) ("[A] basic tenet of statutory construction, equally applicable to regulatory construction, [is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous.").

Although the regulations do not define "natural objects of [decedent's] bounty," we glean certain clues from the 1990 Act's legislative history. When the IRS promulgated its new regulations following the passage of the Act, it explained why it omitted a defini-

tion for this particular phrase. The agency said "[t]his concept has long been part of the transfer tax system and cannot be reduced to a simple formula or specific classes of relationship. The class of persons who may be the objects of an individual's bounty is not necessarily limited to persons related by blood or marriage." Special Valuation Rules, 57 Fed.Reg. 4250, 4253 (1992).

■ Hence, an intended beneficiary need not be a "relative," in the commonly-understood sense of the word, to qualify as a natural object of a decedent's bounty. Nevertheless, for an agreement to be testamentary, the beneficiary must have enjoyed a relationship with the decedent in which he was considered as though he were in some manner related to the decedent. *Cf. Estate of Schwab v. Commissioner*, 42 T.C.M. (CCH) 989 (1981) (finding that decedent's housekeeper and companion, who lived and travelled with decedent for roughly 33 years, was a natural object of the decedent's bounty for purposes of determining whether certain of decedent's lifetime transfers were made in contemplation of death).

Obviously, when there is no blood or marital tie between the decedent shareholder and the other parties to the restrictive agreement, a declaration that the agreement does not evince a testamentary intent is greeted with considerably less skepticism. *See Estate of Seltzer*, 50 T.C.M. (CCH) at 1254 ("In this case only two of the five agreeing shareholders were legally related.... With those facts, it is less likely that relationship would have played a role in the execution of the Agreement."); *Estate of Carpenter*, 64 T.C.M. (CCH) at 1280 ("[T]he lack of [a family] relationship has been considered evidence of a lack of testamentary intent by the agreement."); *cf. Estate of Lauder*, 64 T.C.M. (CCH) at 1657 ("[I]t is evident that intrafamily agreements restricting the transfer of stock in a closely held corporation must be subjected to greater scrutiny than that afforded similar agreements between unrelated parties."); *Cameron W. Bommer Revocable Trust v. Commissioner*, 74 T.C.M.

(CCH) 346, 355 (1997) (same). Thus, in order to apply Treas. Reg. § 20.2031–2(h) with greater scrutiny, sufficient evidence must first exist to suggest that an unrelated party shares a relationship with decedent such as to be effectively considered a member of his family. In this respect, we do not foreclose the possibility that the existence of past transfers of property at significantly less than market value, or of arrangements designed to do the same, might, in appropriate circumstances, give rise to an inference that the transferee was effectively considered a member of decedent's family.

None of the evidence in the case at hand supports such an inference that Simone—to whom decedent's shares were passed—enjoyed an especially close relationship with decedent. The tax court characterized the relationship between Simone and Gloeckner simply as a "close personal" one. Although Gloeckner made two loans to Simone in different years totalling $175,000 and named his "friend" Simone a minor beneficiary in his will, we have no other information about decedent's feelings toward this associate beyond this small glimpse. What *is* in the record is Simone's uncontradicted testimony that the two of them maintained a "business relationship." The tax court does not suggest that Simone held a place in decedent's life similar to that held by his kin. Nor did the Commissioner introduce evidence to support such a theory, even though it advised the trial court it would do so. As a consequence, Gloeckner's relationship with Simone strikes us as "a little more than kind," but certainly "less than kin." [1]

■ Moreover, it is appropriate when analyzing the relationship between the decedent and the beneficiaries of a restrictive agreement to look at not only the relationship itself, but also the circumstances surrounding the agreement. *See Slocum v. United States*, 256 F.Supp. 753, 755 (S.D.N.Y.1966) (holding that the family relationship among the shareholders, combined with the poor health of one of those family members at the time the restrictive shareholder agreement

---

1. This phrase is the mirror image of Hamlet's aside: he is "a little more than kin, and less than kind." W. Shakespeare, *Hamlet*, Act I, Sc. II, ln.

65. Hamlet makes this comment after his uncle, who had murdered his father and then married his mother, hailed him as "son."

was drafted, raised an inference that the agreement was testamentary in nature); *see also St. Louis County Bank,* 674 F.2d at 1210–11 (holding same, with the additional fact that the value of the shares, according to the formula set forth in the agreement, had dropped to zero at the time of decedent's death because the nature of the business had completely changed).

The other circumstances divulged by this record lend no support to the tax court's implicit conclusion that Gloeckner sought to convey his shares to a natural object of his bounty. For example, there was no evidence that Gloeckner was in poor health when he executed both the agreement and his will in 1987. To the contrary, Simone testified that decedent hoped to run his business "for another 20 years." Further, in contrast to the situation in *St. Louis County Bank,* where a zero value on the shares meant no estate tax would be assessed, the agreement did not place Gloeckner's kin in a position to avoid all estate taxes. As it turned out, Gloeckner's plan that his estate taxes be paid completely out of the proceeds of the sale of his stock did not come to fruition. His kin, as noted, had to pay nearly $1 million in estate taxes and expenses.

At the same time, although Simone ultimately owned 100 percent of the company due to the 20 shares given him by Gloeckner in 1987, the business was worth much less since it was forced by the agreement to redeem all of decedent's shares at a price exceeding $2 million. In contrast, had common shares of stock not been redeemed, Simone could have received them at no cost to him or the company through the bequest in decedent's will. Simone was, accordingly, actually worse off because of the redemption agreement. Indeed, and most importantly, in the peculiar circumstances of this case, at the time the agreement was made and while Poesch was still an owner of the company, both Gloeckner's kin and Simone would most likely have been better off had the redemption price been higher than it was. Given this fact, it is hard to see how the agreement could be viewed as a testamentary scheme designed to favor natural objects of decedent's bounty.

■ As a final consideration, courts scrutinize the processes employed in reaching the share price contained within the redemption agreement to shed light on the nature of the relationship between the decedent and the person to whom the stock was conveyed. *Estate of Lauder* was concerned with the absence of a formal appraisal and the failure to consider the specific trading prices of comparable companies or to obtain professional advice, especially when decedent's son, who settled on the values, was an experienced businessman with the family's international cosmetics company. *See* 64 T.C.M. (CCH) at 1658. *Cameron W. Bommer Revocable Trust* was equally leery of decedent's failure to hire a professional appraiser, consulting instead only once with his attorney who had completed the computations in one day. *See* 74 T.C.M. (CCH) at 356.

No similar problem exists here. Gloeckner hired KPMG Benchmark, an independent accountant, to assign a value to the stock. The firm comprehensively analyzed the various factors earlier enumerated. Furthermore, the appraiser interviewed company management and other advisors and reviewed the bases of investors' appraisals of publicly-traded shares of comparable companies at the valuation date. The end result was a 27–page report complete with appendices. Unlike the agreements in *Estate of Lauder* and *Cameron W. Bommer Revocable Trust,* there is no suggestion that the appraisal Gloeckner obtained either ignored relevant industry practices or was hastily conducted. We have no cause therefore to question Gloeckner's motives as to whether a fair value was placed on his shares. Indeed, further evidence that the fixed price was fairly obtained is found in the fact that Poesch sold his shares to the company in 1988 at the price that KPMG Benchmark set in its report.

Finding no evidence to support the view that Simone was a natural object of Gloeckner's bounty, the tax court erred in classifying Gloeckner's redemption agreement as a testamentary device as that term is used in Treas. Reg. § 20.2031–2(h) and rejecting the price included in the Gloeckner agreement. Having made this determination, we

need not consider whether the agreement reflects full and adequate consideration. *See Estate of Seltzer,* 50 T.C.M. (CCH) at 1254 (ending its analysis after having found the agreement was not a testamentary substitute, even though other considerations suggested the fixed price was too low); *Estate of Carpenter,* 64 T.C.M. (CCH) at 1279–80 (same); *cf. Estate of Lauder,* 64 T.C.M. (CCH) at 1659 (continuing its analysis to discern whether the price paid reflected an adequate and full consideration in money or money's worth only after having found a fair inference that the restrictive agreements at issue were designed to serve a testamentary purpose). Neither are we obliged to explore the alternative arguments raised by petitioners.

### CONCLUSION

Treas. Reg. § 20.2031–2(h) prohibits a restrictive agreement from fixing the value of closely-held stock for estate taxation purposes when the intent of that agreement is to pass those shares to the natural objects of decedent's bounty for less than adequate and full consideration. In this case, no evidence suggests that the recipient of Gloeckner's shares—Simone—was a natural object of Gloeckner's bounty. The agreement instead served the *bona fide* business purpose of preserving the leadership role of Simone, a business associate, within decedent's corporation. Hence, we reverse the order of the tax court and remand with instructions to vacate the tax deficiency assessed against Gloeckner's estate.

Reversed and remanded.